Filed 8/5/21; certified for pub. 8/31/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| MICHELLE LEE ASHBY, | |
| Petitioner and Respondent, | G058474 |
| v. | (Super. Ct. No. 16D006919) |
| JEFFREY BRYAN ASHBY, | O P I N I O N |
| Appellant. | |

Appeal from an order of the Superior Court of Orange County, Nathan T. Vu, Judge. Affirmed. Motions to strike denied.

Masson & Fatini, Richard E. Masson and Susan M. Masson for Appellant.

Horvitz & Levy, Jeremy B. Rosen, Sarah E. Hamill, and Megan S. Wilson; Family Violence Appellate Project, Jennafer Dorfman Wagner and Cory Hernandez for Petitioner and Respondent.

Jeffrey Bryan Ashby (Jeff)[1] appeals from the trial court's decision to renew a domestic violence restraining order (DVRO) issued against him to protect his ex-wife Michelle Ashby. He asserts the court erred because the DVRO is not supported by substantial evidence and the court abused its discretion by failing to independently review relevant evidence relating to more current events. We conclude there was no abuse of discretion and Jeff forfeited his substantial evidence challenge by failing to set forth all the relevant and material evidence supporting the trial court's decision. We affirm the order.

FACTS

Jeff and Michelle married in 2005 and separated in 2016. At that time, they had four children between the ages of 4 and 10 years old. On July 28, 2016, the court granted Michelle's ex-parte DVRO based on multiple incidents of domestic violence.

I. *Original DVRO 2016 – Trial Judge M. Marc Kelly*

In her request for a DVRO, Michelle described a pattern of escalating verbal and physical abuse. In addition to describing two recent altercations in detail, Michelle provided the following information: "Whenever we are home and an argument erupts, Jeff will make threats to throw me out on the street with nothing, and take our children away from me and never let me see them again. He will use intimidation, such as taking his handgun, which he carries at all times on his belt holster, off his belt and placing it in a conspicuous place for me to see it during the argument. I am truly afraid for my life whenever he does this, as I don't know if this time will be the time he snaps and decides to shoot me. [¶] Jeff's anger has been getting worse and worse over the past several years. As things have gotten more financially strained for us, due to his spora[d]ic employment status, his level of anger, bitterness and frustration have led to more and great levels of arguments. He takes out all of his frustrations on me and the

---

[1]     For the sake of clarity, we will refer to the parties by their given names.

children.  He gets so loud when he gets angry that the children begin crying hysterically.  This only makes him angrier.  I fear for the safety of myself and my children."

Michelle added she was a victim of financial abuse because Jeff would restrict her access to money by failing to deposit money in the bank and by "hoarding cash to spend on himself."  She was financially dependent on Jeff, who used money from a family trust to pay the mortgage and bills (such as insurance, cell phones, groceries, and utilities).

Michelle noted Jeff had a permit to carry a concealed weapon, and typically had one with him at all times.  She stated, "I am extremely fearful of what Jeff will do when he finds out about my filing this DVRO.  He owns more than 100 guns of all different types, and due to the way he has responded to what would be considered even the slightest provocation, with rage and now violence,  I am truly fearful that he may react in an extremely violent, possibly deadly, manner."

Michelle described the two most recent incidents of domestic violence as follows:  "On July 11, 2016, I was visiting my mom in Idaho. . . . Jeff was supposed to go, but my uncle offered him a short term job in Arizona, which he took. . . . At approximately 9:30 p.m. Jeff and I were having a phone conversation when he began screaming at me over the phone so loudly that my aunt later told me she could hear everything he was saying.  He began threatening me that he was going to take the children away from me, kick me out of the house and leave me with nothing but the clothes on my back.  This is just an example of how he has been emotionally and verbally abusing me for a long time."

She stated a second incident occurred on July 23, 2016, as follows:  "[A]fter the children and my [a]unt and [u]ncle went to bed, [Jeff] and I were having a discussion that escalated into a fit of anger by Jeff, where Jeff spent over an hour verbally and then eventually physically abusing me.  He said that I could not do anything but be a full-time mother.  He told me that I was not smarter than him and that I did not have the

3

right to discuss graduating from college recently, or my degree, with anyone. He threatened to take a chainsaw to my office furniture. He also threatened to take my children and leave me on the street with nothing but the shirt on my back. [¶] During this discussion, he kept his loaded firearm exposed on a shelf next to the TV in the living room while the incident was happening. The presence of his loaded firearm was extremely intimidating. Therefore, I was not yelling and trying to be as calm as possible. I went to the kitchen and started cleaning and picked up a cup of water and dumped it into the sink. He became infuriated because that was his water. He shoved me with his left forearm and caused bruising on my right bicep forcing me to lose my balance. His continued screaming at me during this time woke up our oldest daughters. When our 8-year-old daughter started screaming, I ran upstairs to be with her and comfort her and also our 10-year-old daughter, who was hiding under the covers. They asked me to stay with them and were scared because Daddy was screaming. [¶] Jeff went upstairs slammed the bedroom door shut and locked me out. I went downstairs to get my cell phone and Jeff returned downstairs to get his firearm. At that time[,] I ran upstairs to get my toothbrush and toiletry bag and ran to the guest bathroom. He returned to our bedroom and slammed the door and locked me out again. I then noticed the mark on my arm and knocked on the room door that my [a]unt and [u]ncle were in. They were awake and heard what was happening. My [a]unt saw my arm and wanted to call the police. Instead, I asked my uncle to get Jeff out of the house early in the morning to return to Arizona."

Michelle's aunt filed a supporting declaration. She confirmed Michelle's account of the two incidents of abuse. She added that Michelle's right arm had a large red mark where Jeff had shoved her. Michelle's aunt took a photograph of the injury, which was provided to the court. Michelle's aunt stated she felt afraid to be around Jeff and changed her travel plans to stay with Michelle and the children to provide support.

4

Jeff opposed the DVRO request, denying he physically, financially, or verbally abused Michelle. He stated that after obtaining the temporary restraining order, Michelle filed a petition to dissolve the marriage. He did not want a divorce and could not understand why Michelle was making "terrible and false accusations." He claimed Michelle was lying when she accused him of using a weapon to intimidate her. He noted that they both had concealed weapons permits and they were "very familiar and accustomed to firearms as a daily part of [their] lives." He asserted he was a licensed firearms instruction and owned "130 firearms, one of which I generally carry on my person every day." Jeff declared Michelle owned 14 firearms and they had four gun safes in their home.

At the hearing, the court considered testimony from the parties, Jeff's brother, and Michelle's aunt. It granted a three-year DVRO (covering Michelle and the children).[2] At the hearing, the court stated the following: "So I've looked at everything. I heard everything. This is not even a close call for me." The court listed several factual findings supporting this decision. It stated Jeff and Michelle's marriage the past few years has "had a lot of volatility" which "both sides" contributed to. Nevertheless, the court rejected Jeff's argument the recent incidents of domestic violence was a he-said-she-said situation. It explained Michelle's story was corroborated by (1) "[t]he fact that the screaming and the yelling and the emotions were so loud that they woke up everybody in the household," (2) the parents agreed it was not a "normal situation when the kids are trembling and having to be consoled," and (3) the photograph of Michelle's injury. The court noted it believed Michelle's testimony she still felt pain. It stated the bruise was still visible although the incident occurred almost a month ago. The court also found credible Michelle's testimony that Jeff "was inches away from [her], was

---

[2]    Jeff did not provide a reporter's transcript of his brother's testimony. In ordering the DVRO, the trial court stated it relied on Jeff brother's testimony that the day after the incident he saw Michelle crying and she looked afraid.

clenching his fists with an enraged voice . . . ." The court also relied on Michelle's aunt's testimony and Jeff's brother's testimony that Michelle was afraid. The court stated it did not find credible Jeff's testimony that he did not touch Michelle. Finally, the court stated, "the fact that there was a loaded firearm within reach is a factor." The court explained it was not a "major factor" but it could have been if Michelle wasn't herself "schooled in firearms training" or had never seen Jeff with a loaded weapon before. It concluded, "So I don't think that was a particular major factor, although this kind of violence with the screaming and the physical contact and everything else, the fact that there was a loaded firearm within reach, it certainly went to her state of mind and it was a factor concerning the overall situation that the court incorporates."

The court granted Michelle full custody of the children, and granted Jeff visitation the first, third, and fifth weekend of the month as well as Wednesday nights. The DVRO provided Jeff must stay 100 yards away from Michelle and children, except for brief and peaceful contact for court ordered visitation. The court ordered Jeff to complete a 52-week batter's intervention program, which included an alcohol component. The court also ordered Jeff to refrain from drinking for 24 hours prior to visitation. It restricted Jeff's access to all guns and rejected his request to have limited access to weapons for purposes of employment. The parties were ordered to enroll in the parent communication program called Talking Parents.[3]

II. *DVRO Modifications*

In February 2017, Michelle filed an ex parte request for the court's assistance after she learned Jeff drank alcohol while at dinner with the children. Before

---

[3]     Talking Parents is an online co-parenting communication tool. (See *Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 364; https://talkingparents.com.) Courts will order parties to use the program because it preserves communications between the parties.

the court ruled on the request, Jeff volunteered to wear an alcohol monitoring bracelet offered by SCRAM (Secure Continuous Remote Alcohol Monitoring Program).

In 2017, the court amended the DVRO a few more times to reflect changes in visitation and custody. For example, in April 2017, the court modified the DVRO to permit the family to attend family counseling together to work on developing co-parenting skills. However, it imposed procedures to ensure the therapist was always present when Jeff and Michelle were in close proximity. The court ordered Jeff "shall not track" Michelle using the children's iPhone applications or other applications. The court permitted Michelle to disable the children's iPhone "location services" when they were in her custody and Jeff was ordered not to turn the location applications on.

III. *Move Away Request & Termination Request – Trial Judge Layne H. Melzer*

In June 2017, Michelle sought amendment of the DVRO to permit her and the children to move to Idaho. She argued the move was necessary for the following three reasons: (1) she could not continue to live in Orange County because she "still live[d] in terror every day that" Jeff would hurt or kill her and she knew Jeff was stalking her; (2) she found stable housing and a job in Idaho that would provide her family financial security because Jeff failed to make child support payments and his mother evicted her and the children from their home and had taken away the family car; (3) it would be in the children's best interest to move away due to Jeff's excessive drinking. She wanted Jeff to maintain a relationship with the children and suggested he care for them eight weeks in summer and part of their school winter and spring breaks.

In response, Jeff filed a request to terminate the DVRO. Alternatively, he requested modification of the DVRO to exclude the children as protected parties, lift the firearm restrictions, and return the guns he stored with his mother. He asserted the situation had materially changed for several reasons. He explained the DVRO required he turn in 127 guns to a licensed gun dealer, costing him over $3,000 per month in storage fees. He claimed half of the weapons belong to his mother, Doralee Ashby.

7

Before the DVRO, Jeff stated he worked as a firearms instructor and as an independent contractor performing construction work. He asserted he had been unable to work since the DVRO because his construction licenses were suspended due to tax liens and the restraining order required that he stay away from guns.

Jeff stated Michelle mistakenly believed she has a community property ownership right to the family home in Mission Viejo and the family car, a Chevrolet Suburban. Jeff acknowledged the court gave Michelle exclusive use of the house and car, but asserted this ruling was improper because Doralee and her company Falcon Wolf Properties owned everything. He noted the family law court joined Doralee into the dissolution case after she initiated an unlawful detainer action to repossess the house. Jeff denied having a legal right to receive "regular income" from his mother's trust.

Other changed circumstances included Jeff's enrollment in anger management counseling and parenting classes. Jeff claimed he and Michelle had attended co-parenting counseling for seven months. Jeff did not believe he posed a threat to Michelle or the children, and he did not have substance abuse issues. He stated there was no reason for Michelle to be afraid of him. He noted Michelle contacted him via text and phone to discuss matters unrelated to the children. He asserted Michelle relied on the DVRO "when she wants to keep me away from our children, control the extent to which I am able to parent our children, get money, control the progress of this divorce proceeding."

On December 11, 2017, Michelle filed an ex parte request for a temporary move away order to Palm Springs or to expedite the hearing date on her request to move to Idaho. Michelle explained she was going to be evicted from the family home and needed to temporarily move to Palm Springs. Alternatively, Michelle asked the court to consider a terminating sanction and immediately grant her move away request to Idaho. She also asked the court to order Jeff to return the Suburban "which he and his mother towed away violating the DVRO." Michelle stated she could not rely on Jeff for

8

assistance because he was six months behind in his support payments and owed over $18,000 in back support. She added Jeff refused to pay for or start the family court ordered Evidence Code section 730 evaluation (section 730 evaluation) needed to make custody determinations. She claimed Jeff told the children they would live with him in the house after Michelle moved out. He was overheard in the courtroom hallway saying, "'I cannot wait for the Sheriff to show up and escort that bitch out of my house.'"

Michelle reported Jeff offered their daughter $10 to take Michelle's court-related documents, causing the child to feel anxiety and fear about doing something wrong or causing her father to become angry. Jeff stopped attending the co-parent counseling and refused to return unless Michelle amended the DVRO. She attended the last scheduled appointment by herself. Michelle reported their therapist expressed concerns about Jeff's "display of anger in . . . counseling sessions and recommended that I have a plan in the event that the court grants the move away." Specifically, the therapist suggested that Michelle "go into hiding with the children for [their] safety while waiting for the order to be final."

Michelle offered several examples of how Jeff violated the DVRO. He continued to track her movements through the children's cell phones. He approached her home to assist the tow truck driver in repossessing the family car. He submitted a false job offer to regain access to his guns.

At the hearing, Judge Melzer considered the move away request, Jeff's efforts to modify/terminate the DVRO, as well as property and custody issues related to the marital dissolution action. Michelle testified how her relationship with Jeff was worse since the court issued the DVRO. She accused Jeff of stalking her on iPhones and making poor parenting decisions. Michelle expressed fear Jeff would keep the children from her because he often altered the set visitation schedule. She said there was one occasion when Jeff refused to return the children and she was forced to call the sheriff for assistance.

9

The court issued a 48-page ruling.[4]  It set forth the procedural history of the case, making several observations and factual findings.  It noted Judge Kelly, in considering the initial DVRO, determined there was a clear case of domestic violence, Michelle's testimony was credible, but Jeff's testimony was not.  The court recounted evidence Jeff was verbally and physically abusive.  The court also determined Jeff's display of a loaded gun during the incident "played a role in the finding of" domestic violence.  The court reported that while Michelle's physical injuries were not serious or debilitating, she and the children were afraid as a result of the domestic violence.  The court noted the previous court was concerned by Jeff's alcohol consumption.  In reviewing the DVRO's many amendments, the court stated Jeff had repeatedly "taken extreme exception" to the firearm restrictions.

In its ruling, the court provided some background information about the hotly contested property dispute in the dissolution action.  The trial was bifurcated to first consider Doralee's ownership rights of the family home, car, and various items of personal property.  The court noted, "Although the claims were largely brought for the benefit of the community and [Jeff] was not an essential participant in those proceedings, he chose to participate as [Michelle's] adversary throughout the entire trial with counsel paid for by Doralee."  Two attorneys separately represented Doralee (one representing her individually and the other representing her limited liability company).  Thus, Michelle as a self-represented litigant, went against three sets of lawyers "all of whom were paid for by Doralee."  In the end, Doralee returned the Suburban to Michelle and initiated legal proceedings to evict Michelle and her grandchildren from the family home.  The court noted Jeff resided with his mother and he was "entirely dependent upon her for his basic needs."  It was anticipated she would give Jeff a new place to live after she evicted Michelle.

---

4        For ease of reading, we omitted all italics from the text of the trial court's ruling.

10

The court observed that the trial court deciding the property dispute, like Judge Kelly, made adverse findings regarding Jeff's credibility. "Specifically, this [c]ourt stated[,] 'The [c]ourt did have serious concerns with the credibility of [Jeff] based on unrebutted evidence that he falsified documents and submitted these false records to the [c]ourt as part of an effort to have the [c]ourt modify the operative [DVRO] issued earlier in this case against [him].'"

In its ruling, the court also discussed the procedural history leading up to the current hearing. It explained that in March 2017, the court bifurcated the issues of custody and visitation and appointed counsel for the minors. Before the matter was heard, Michelle requested a move away order. In August 2017, the parties stipulated to have an expert conduct a section 730 evaluation and "[Jeff] and/or Doralee agreed to advance all monies necessary to complete this critical custody evaluation." The court noted that despite "the specter of a 'move away'" and the pending custody/visitation trial, Jeff "declined to fund the [section] 730 evaluation." The court stated this decision "was puzzling" particularly given "the expected benefit to the children and parties" from an expert evaluation of custody issues in a move away case, but also "the manner in which [Jeff/Doralee] instead chose to allocate financial resources." The court also found relevant that Jeff countered the move away request with his own petition "to have the DVRO terminated or modified so that he could again possess firearms." Jeff claimed the gun storage cost $3,000 per month and due to the firearm restrictions, he was unable to work or pay support.

The court recounted that the parties were given a full evidentiary hearing that lasted five day without the benefit of the professional custody evaluation Jeff "had agreed (and was ordered) to fund." The court stated, "Overall, as was the case with the DVRO trial and the [p]roperty [t]rial, this [c]ourt found that [Michelle's] testimony was more credible and reliable than [Jeff's]." The court was under the general impression both parents loved their children and had strong parent-child relationships.

11

Turning first to the issue of Michelle's move away request, the court determined the DVRO's custody order was not permanent, and final custody/visitation orders required consideration of the children's best interests if they moved to Idaho. Following well established case precedent, the court determined it was in each child's best interest to reside permanently with Michelle and a change in custody was not in their best interests.

The court concluded the parties' testimony about their finances was a highly relevant factor in making its custody decision. It stated financial constraints had motivated Michelle's move, and economic realities demonstrated she was making the request in good faith and Jeff "is better able to handle the financial challenges of being the non-custodial parent." The court discussed the inconsistencies with Jeff's testimony about his ability to work and provide for his family. At times, Jeff claimed the only way to earn a living was if the DVRO restrictions were lifted so he could become a shooting instructor (the plan he told his children) or work in the construction industry. Other times Jeff stated he could not earn enough working in construction. Alternatively, he stated, "repeatedly in 'talking parent' exchanges . . . that one of the reasons he couldn't pay child support (CS) was because his mother Doralee would no longer agree to fund and he could not independently pay support without getting the [DVRO] lifted." The court noted Jeff "had no particularly good explanation for how he was so certain he would soon be working full time or why he had not sooner found full time or even meaningful part time employment." Moreover, "All of [Jeff's] testimony was inconsistent with earlier statements that if the children were to relocate to Idaho he could not predict if he would have the funds to even visit because he was totally dependent on his mother for financial support."

The court stated Michelle's testimony regarding her financial situation was consistent. Michelle actively sought employment in Orange County and Idaho. She secured a $60,000 per year job offer in Idaho, where there was a lower cost of living and

12

she could stay rent free in her parent's home. Michelle explained Jeff was extremely behind on child support and what little support she received was paid by Doralee. The court believed Doralee had "nonetheless now made clear (through words and deeds) that she would rather pay lawyers to fight with [Michelle] than provide financial assistance that might go to spousal support . . . or CS." She paid "approximately $272[,000] in fees" to Jeff's lawyers and ignored court orders to pay Michelle's needs-based attorney fees and the section 730 evaluation.

The court summarized how Jeff negatively impacted Michelle's financial status. In addition to not paying Michelle support or attorney fees, he "facilitated [her] financial isolation" by helping to confiscate the family car (which had yet to be returned despite court orders) and by "willingly and actively" helping his mother seek ownership of what turned out to be community property. It noted Michelle and the children were receiving government assistance.

The court contrasted Jeff's claims of "poverty" and inability to pay support against evidence Jeff lived a comfortable life funded by his mother and had benefitted from over $270,0000 in legal services. In addition, Doralee planned to buy Jeff a new home and send the children to private school ($8,000 per year for each child) depending on the custody orders. It wrote, "As is her prerogative, [Doralee] has chosen sides and made clear she is unwilling to fund anything that directly benefits [Michelle]."

Based on the above information, the court reached the following conclusions. Facing eviction and deprived of child support, Michelle will be rendered "homeless and near destitute should she remain in [Orange County]." "Perhaps Doralee and/or [Jeff] believed this strategy of 'economic starvation' would force [Michelle] to agree to dissolve the [DVRO] and/or move away without the kids. [¶] (1) If so, this strategy has backfired horribly. [¶] (2) The only thing that this economic starvation has accomplished is leaving [Michelle] with little choice but to move away. [¶] (3) As is her prerogative as the primary care giver, she is unwilling to do without also seeking primary

13

custody." The court concluded that in light of Doralee's "history of largesse when it comes to her son and her grandchildren" Jeff will have greater resources than Michelle when it comes to providing for travel and navigating "what will be a challenging and expensive custody/visitation regime." The court reiterated both parties had an obligation to support the children and themselves and Michelle's plans to move would enable her to achieve financial independence and "model positive behavior for her children."

The court appreciated the risk in giving Jeff primary custody of the children was his mother's "considerable animus" towards Michelle. It determined Doralee "wield[ed] an unusual and unhealthy amount of sway over" Jeff. The court explained Jeff had "strong economic and financial incentives to defer to Doralee" because "[h]e is one disagreement or argument away from himself being homeless." Moreover, Doralee's "antipathy towards" Michelle presented a greater risk of parental alienation if Jeff was to be awarded primary custody.

The court considered other factors relevant to custody/visitation, such as the distance of the move, the children's ages and preferences, the nature of the parent-child bonds, and the ability of the parents to co-parent. On this last topic, the court stated the parents' relationship remained volatile and hostile and these recent legal proceedings had not helped. The court found credible Michelle's testimony about Jeff's angry outbursts in and around the courthouse. Recordings made by Talking Parents further evidenced ongoing co-parenting challenges and Jeff's hostility. The court clarified there was "no evidence that a similar degree of hostility ha[d] been reciprocated by [Michelle.]"

The court discussed one particularly "troubling example of ongoing hostility" regarding Jeff's efforts to contact and involve Michelle's estranged father, Randy Varner, in these legal proceedings. Michelle testified that she and her sisters were abused by their father, and she continued to distrust him. She was adamant she did not want her children to have contact with Varner without her being present, and the court

14

ordered (consistent with the parties' stipulation in 2016) the children would have no contact. The court believed Jeff was acting maliciously when he attempted in December 2017 to facilitate visitation with Varner and modify existing court orders. The court noted Jeff had "made insensitive remarks on [T]alking [P]arents to the effect that [Michelle's] attitude towards her father led to his having health issues." The court concluded Jeff's efforts to involve Varner "seem[ed] to come more from spite than any legitimate concern for the children."

The court determined Jeff rebutted the Family Code section 3044[5] presumption against awarding custody to the perpetrator of domestic violence. The court concluded it was in the children's best interests to move to Idaho. It ordered joint legal custody, but Michelle would have "final decision making authority on issues relating to the children's schooling and medical/dental care and treatment" except when they were in Jeff's care. The court stated Michelle would continue to have primary physical custody. The court also designed a detailed parenting plan for the family after Michelle moved to Idaho. In addition to one weekend per month, Jeff would care for the children for longer periods of time during holidays and vacations. He could attend the children's extracurricular activities that took place in a public setting if he provided Michelle with reasonable notice.

The remaining 14 pages of the court's order focused on whether the DVRO should be terminated. After discussing the relevant case authority, the court concluded Jeff failed to meet his burden of proof to terminate the DVRO or eliminate the firearms restriction. The court stated Jeff sought termination/modification based on evidence there was no need for a DVRO because Michelle was not afraid of him and it was limiting his ability to support himself and his family. The court listed events Jeff claimed proved Michelle no longer feared him, mostly texts or telephone calls Michelle initiated. The

---

[5] All further statutory references are to the Family Code, unless otherwise indicated.

15

court disagreed, stating "these interactions" were "merely instances of 'peaceful contact' as contemplated and permitted by the DVRO" and "demonstrate not a lack of fear but a willingness to co-parent and facilitate [Jeff's] ongoing relationship with the children despite prior conflict including a DVRO[.]"

Moreover, the court determined Michelle's testimony she was still afraid of Jeff to be credible. It described several "interactions" that suggested a "'power and control' dynamic that is often at the core of domestic violence." For example, it concluded Michelle presented evidence to "support[] a reasonable fear or apprehension" Jeff was following or tracking her movements via cell phone. She demonstrated Jeff and Doralee "worked together to gain entry (sometime around midnight)" into her gated community to tow away the family car. Jeff "aggressively sought to remove the DVRO firearms restriction to the point of offering what the court view[ed] as pre-textual justifications and in some instances (as revealed during the property trial) fabricated evidence." Jeff also attempted to use child support "as leverage" to get Michelle to agree to lift the firearm restrictions. The court also mentioned Jeff's continual use of "threatening and aggressive language in Michelle's presence, in and around the courthouse" as well as his spiteful efforts to insert Michelle's abusive father into the proceedings.

The court stated it did not believe Jeff's claim he was unable to support himself or his family unless the DVRO was lifted. The court stated Jeff's testimony was not credible and there were many jobs Jeff could find that did not require him to carry a weapon. The court stated construction jobs were available to people having DVROs. Moreover, that a DVRO "might limit future employment opportunities" was not evidence of a changed circumstance.

The court determined the DVRO helped to reduce conflict between the parties and "the evidence confirms that the risk of future [domestic violence] remains and

16

the DVRO too should remain." However, the court determined it would amend the DVRO to remove the children as protected parties, which would help facilitate co-parenting duties.

IV. *Request to Renew the DVRO – Judge Nathan Vu*

Over a year later, in August 2019, Michelle filed a request to renew the restraining order. Michelle stated she was afraid of future abuse because Jeff had violated the DVRO multiple times, as documented in the court's prior order permitting her to move away. In addition, she stated Jeff had a gun collection and terminating the DRVO would give him access to the weapons and freedom to harass her. She referred to the court's 2018 order denying Jeff's request to terminate the DRVO based on its conclusion there remained a risk of future domestic violence.

Jeff opposed the request stating he completed the 52-week batterer's intervention program, which included an alcohol component. He claimed to have learned valuable skills and he was no longer a threat to anyone, especially Michelle. Jeff asserted that during the past three years he had not violated the restraining order. He admitted there were issues related to the children's cell phones and litigation involving Doralee, but he did not do anything "that knowingly or intentionally or negligently" violated the restraining order.

He stated there were changed circumstances, including significant custody modifications to the DVRO. He explained the custody schedule changes over the past year was "a testament to the devotion and love" he had for his children. He explained that after Michelle moved to Idaho, he was awarded significant time with the children. Jeff stated he made "a diligent and committed effort to co-parent with Michelle" and he had been "cordial, polite, and respectful on each and every one of our encounters." He claimed the DVRO had a detrimental effect on his children because they never saw him verbally, emotionally, or physically abuse Michelle because he never did those things. He stated the children had been wrongfully denied custodial time and been forced to

17

move five times since Michelle filed for a divorce. He maintained, "the lack of stability for our children has made this process much more difficult and uncomfortable for them. But for the restraining order, I expect that I would have received an equal timeshare with our children and hence, I could have provided them with a more stable home and school life." In summary, Jeff concluded there was no reason for Michelle to feel threatened by him because he never violated the DVRO, he lived more than 1000 miles away from Michelle, he had not contacted Michelle for any reasons other than to co-parent, he kept the children out of the dissolution case, he did not have a drug or alcohol issue, and he was employed full-time in the construction industry.

Both parents testified at the hearing. Michelle represented herself and Jeff hired legal counsel. Michelle testified that since the move away orders, "Jeff has escalated in his unwillingness to co-parent. He has repeatedly violated the DVRO as stated in the [court's prior] ruling." She noted the previous trial judge concluded the DVRO reduced conflict between the parties and there was a clear risk of future domestic violence if the order was terminated. Michelle testified Jeff had not posted a communication through Talking Parents in over a year and he did not respond to her communications. She stated Jeff utilized the children as messengers so his words would not be recorded. She complained Jeff still failed to comply with financial orders, and she believed that if it were not for the Department of Child Support Services, he would continue to ignore those orders. She added Jeff failed to follow the court's directions regarding custody exchanges of the children. For example, Jeff would not reply to her questions about summer travel plans or follow the court's order to transfer custody of the children at the airport. Instead, with very little notice, Jeff demanded Michelle bring the children to his hotel.

The court interrupted Michelle's testimony about parenting and custody disputes. The court stated it understood she and Jeff still did not get along. The court asked Michelle to explain why she had a reasonable apprehension or fear of future abuse.

18

She replied that Jeff withheld money to try to abolish the DRVO and regain access to his weapons. She noted there was evidence he had violated the DVRO repeatedly. She felt continually harassed and afraid of him. She believed the DVRO added "a level of safety and something that I have to refer back to when the situation arises." "I am very much still in fear of [Jeff], and his actions haven't given me any evidence that he doesn't still hold an immense amount of hostility towards me, and it is for this reason that I [have] requested the restraining order be renewed." Michelle added Jeff continued to use the tracking application on the cell phones.

The court recited the applicable legal standards and relevant factors before concluding Michelle had met her burden of proof. It renewed the DVRO for five years.

DISCUSSION

Jeff's first argument is the trial court abused its discretion by "failing to fully evaluate and appreciate the *current circumstances* in relation to the events leading to the DVRO." (Italics added.) He maintains the court improperly relied entirely upon earlier findings made by Judge Kelly and Judge Melzer relating to the DVRO. Jeff's second argument is that insufficient evidence supports the court's decision to renew the DVRO because Michelle failed to prove she *currently felt* any apprehension of future abuse. These two arguments are essentially the same: Jeff maintains there was insufficient evidence to support the court's ruling. However, by significantly downplaying the seriousness of his actions and reciting only favorable evidence, Jeff forfeited his sufficiency of the evidence claim. He also failed to meet his burden of showing the court refused to consider evidence relating to current changed circumstances or that it abused its discretion.

I. *Standard of Review*

"We review an appeal from an order denying a request to renew a domestic violence restraining order for abuse of discretion. [Citations.] . . . [A]n abuse of discretion occurs where ""the trial court exceeded the bounds of reason. When two or

19

more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" However, the question of 'whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review.' [Citation.]" (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 560.) The trial court's order "is presumed to be correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent. [Citation.] It is the appellant's burden to affirmatively demonstrate error. [Citations.]" (*In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 977-978.)

II. *Applicable Legal Principles Regarding DVRO Renewals*

Section 6345, subdivision (a), provides in relevant part, a DVRO "may be renewed upon the request of a party, either for five years or permanently, *without a showing of any further abuse* since the issuance of the original order . . . ." (Italics added.) In *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1283 (*Ritchie*), the Second District resolved an issue of first impression by interpreting section 6345 to mean the renewal of the DVRO requires there is a reasonable apprehension of future abuse if the initial order expires. The court reasoned, "[S]ection 6345 makes it unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect. It would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order. If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order. Indeed the fact a protective order has proved effective is a good reason for seeking its renewal. [¶] But this does not suggest the trial court need make no finding beyond the petitioning party's subjective desire to have the existing protective order extended—in this case for a lifetime." (*Ritchie, supra,* 115 Cal.App.4th at p. 1284.)

20

In deciding what factors trial courts should consider in evaluating whether there was "reasonable apprehension of future abuse," the *Ritchie* court examined several "tests" developed by appellate courts in other states. (*Ritchie, supra,* 115 Cal.App.4th at pp. 1285-1289.) It rejected the "'imminent and present danger' standard used by Missouri courts, adopting instead a lower standard requiring the courts to determine if the protected party has a 'reasonable apprehension' abuse will occur at some time in the future if the protective order is allowed to expire." (*Id.* at p. 1288.) The court ultimately held: "We conclude that in California, as in the rest of the country, an objective test must be satisfied before a protective order is renewed in contested cases. From the language of California statutes and the legislative history, we have drawn the following formula (limited, however, to cases where the restrained party appears and challenges the requested renewal of the existing order). A trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse. So there should be no misunderstanding, this does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Id.* at p. 1290.)

The *Ritchie* court discussed factors the trial court should consider in applying this test. (*Ritchie, supra,* 115 Cal.App.4th at p. 1290.) The court stated the evaluation is different from deciding whether to issue the original order. "For one thing, there is that existing order and the factual predicate for its issuance—typically prior acts or at least threats of abuse, . . . or similar evidence of the restrained party's predisposition to inflict abuse, and the like. The existence of the order itself often will be less telling than the facts supporting its issuance. Consequently, the trial judge ordinarily should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse should the existing order expire. [¶] [T]he trial court should not

21

permit the restrained party to challenge the truth of the evidence and findings underlying the initial order, as . . . [t]his would contradict principles of collateral estoppel and undercut the policies supporting those principles." (*Ibid.*) It noted the prior protective order "seldom if ever will provide *conclusive* evidence the requesting party entertains a 'reasonable apprehension' of future abuse of any kind should that order expire." (*Id.* at p. 1291.) However, "the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test." (*Ibid.*) The court added, "Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order? Or have there been no significant changes or even perhaps changes that enhance the opportunity and possibility of future abuse?" (*Ibid.*) Finally, the court concluded the "'burdens' the protective order imposes on the restrained party" in some cases can be relevant, but "would never justify denial of a renewed protective order where the 'reasonable apprehension' is of future acts of *physical violence.*" (*Ibid.*)

Due to the argument raised in this appeal, it is helpful to understand the standards set forth in the *Ritchie* case do not apply to a restrained party's termination request. A DVRO is a type of injunction, and the applicable standards the court must apply when considering whether to dissolve an injunction are found in Code of Civil Procedure section 533. As noted by one appellate court, "the party protected by a restraining order has *already* made the required showing to obtain a renewal of the order" and therefore the burden rests on the restrained party "to show by a preponderance of the evidence that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies a termination of the restraining order. [Citations.]" (*Loeffler v.*

22

*Medina* (2009) 174 Cal.App.4th 1495, 1504 [the three independent grounds are material change in facts, change in the law, or the ends of justice].)

III. *Analysis*

A. *Sufficiency of the Evidence*

Simply stated, Jeff contends the trial court abused its discretion by renewing the DVRO because Michelle did not meet her burden of proving she had a reasonable apprehension of future abuse. We conclude Jeff forfeited this argument.

""""When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." [Citations.]' [Citation.] The judgment is presumed to be correct. [Citation.] And we presume that the record contains evidence to sustain every finding of fact. [Citation.] It is the appellant's burden to demonstrate that it does not. [Citation.]" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)[6]

"That burden is a heavy one: '"A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point*, favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]" [Citation.] "[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when

---

[6]    In his reply brief, Jeff asks this court to treat Judge Vu's minute order and/or the reporter's transcript of the hearing as being the equivalent of a statement of decision to avoid the doctrine of implied findings. We decline this request because (1) it is a new argument raised for the first time in the reply brief, (2) the record reflects the trial court did not intend for its minute order or statements on the record to be a statement of decision, and (3) Jeff did not request a statement of decision.

appellant has shirked his responsibility in this respect."'  [Citation.]"  (*In re Marriage of Marshall* (2018) 23 Cal.App.5th 477, 487.)

Jeff has made no effort to satisfy his significant burden on appeal. Throughout his briefing, Jeff improperly refutes the factual basis for the original DVRO. (*In re Marriage of Martindale & Ochoa* (2018) 30 Cal.App.5th 54, 60 [restrained party collaterally estopped from challenging sufficiency of the evidence supporting issuance of initial restraining order and courts should not entertain new evidence regarding the underlying incidents].)  In the factual summary, he described the family history in one short paragraph as simply involving an 11-year marriage that produced four children.  His account of the case's procedural history ignores significant events in the case.  For example, he described the components of the original DVRO, but omitted any details about the allegations of verbal, physical, emotional, and financial abuse.  Instead, he highlighted the burdens created by the DVRO and how it impacted his ability to work as a firearms instructor.  In a related footnote, Jeff stated it was "important" for this court to understand he and Michelle were gunowners.  He elaborated they both were trained in firearms, had concealed carry permits, and owned multiple weapons.  Jeff asserted "the guns were not an issue during the marriage."

Domestic violence, not gun ownership, was the issue.  Domestic violence (physical, financial, and emotional) ended the marriage and was the basis for the DVRO. Yet neither Jeff's factual summary or legal discussion includes a description of the evidence supporting issuance of the DVRO, the stalking, or the financial starvation, which prompted Michelle to request a move away order.  Jeff omits the reasons why Judge Melzer denied Jeff's request to modify/terminate the restraining order.  As stated in the *Ritchie* case, the facts supporting issuance of the DVRO "often will be enough in themselves to provide the necessary proof to satisfy [the] test."  (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.)

Like his factual summary, Jeff's legal analysis sets forth a one-sided narrative of events. With laser sharp focus, Jeff sticks to his story that he never violated the DVRO, and therefore, Michelle never had a reason to fear him. By concentrating only on current events, Jeff paints an idyllic picture of having a harmonious co-existence with Michelle, where they are successfully navigating joint custody of their children while peacefully living over 1,000 miles apart. He laments that if only Judge Vu had properly evaluated evidence relating to the parties' current circumstances, he would have reached a different result. This argument turns our standard of review on its head. We do not review the evidence to see if there is substantial evidence to support the losing party's version of events. Our power begins and ends with a determination if there was substantial evidence in the winning party's favor. For this reason, Jeff was required to set forth, discuss, and analyze both the favorable and unfavorable evidence. "'"Unless this is done the error is deemed to be waived."'" [Citation.]" (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)

In his reply brief, Jeff responded to Michelle's forfeiture argument. The caption for his first legal argument stated, "the opening brief properly presented all evidence supporting the order[.]" (Capitalization and bold omitted.) The legal discussion is divided into two parts. In the first subpart, Jeff argued he properly included in the appellate record all the documents relied upon by the trial court. Jeff acknowledged Michelle augmented the record with an additional 1,091 pages of documents, including 731 pages of reporter's transcripts. He maintained many of these documents duplicate those already in the appellate record. This argument misses the mark. Jeff did not forfeit his sufficiency of the evidence argument because his appellate record was lacking pages. The problem was that his opening brief failed to fairly summarize both the favorable and unfavorable evidence supporting the ruling.

The caption of the second subpart asserts the following: "The opening brief properly and fairly presents the facts and evidence to this court; It is respondent's brief

that misrepresents the trial court's findings[.]" (Capitalization and bold omitted.) However, Jeff failed to direct our attention to any portion of his opening brief to prove his point, but rather cited to record references he believed showed Michelle unfairly presented the facts in her brief. This argument overlooks the basic rule of appellate procedure that it was Jeff's burden, not Michelle's burden, to affirmatively demonstrate error. To prevail, Jeff was required to argue why the relevant evidence (including facts unfavorable to his position) compelled a different result. Jeff set forth only favorable evidence, which if viewed in isolation may have compelled a different result but did not prove the court abused its discretion in renewing the DVRO.

B. *Weighing the Evidence*

The failure to weigh relevant evidence can be deemed an abuse of discretion. For example, in *Ritchie* the court reversed the renewal order and remanded the case for further review because the appellant was able to affirmatively demonstrate the court did not consider relevant evidence. (*Ritchie, supra,* 115 Cal.App.4th at p. 1281.) The appellant demonstrated error based on the court's *explicit statements* during the hearing that the requesting party was entitled to a renewal by simply making the request. (*Ibid.*) The court determined, "the trial court erred when it issued the renewal order based solely on Ritchie's subjective desire the protective order be extended." (*Id.* at p. 1282.) The trial court "should have considered evidence tendered by both sides and determined whether Ritchie's expressed fear of future abuse was genuine and also reasonable." (*Ibid*.)

In this case, Jeff asserts Judge Vu improperly relied on old factual findings made by prior trial judges and he failed to independently evaluate "the changes in circumstances" in evaluating Michelle's request to renew the DVRO. Specifically, he defines current circumstances as including "Michelle's recent move, the parties thousand-mile separation, the increased custodial time to Jeff," and the lack of recent DVRO violations. He maintains violations relating to custody and financial disputes are

26

"unrelated" to the DVPO and "should not be used to bootstrap an otherwise baseless claim for renewal."

Jeff apparently forgot his trial counsel raised this very same argument at the hearing. In response to the accusation that the court was improperly relying on prior findings, Judge Vu replied, "To be clear, the court looked at all of the facts that were before Judge Kelly and Judge Melzer. *The court also considered the facts that were alleged to have occurred between today's date and March 2018.* The court did not -- to be clear, the court did not find a great number of facts that have occurred since March 2018 that played a role in its consideration either for or against renewal." (Italics added.) In other words, the court specified it considered the previous factual findings as well as current events. We understand Jeff disagrees with the court's determination that the current circumstances evidence did not eliminate the need for a DVRO, however, the record does not support Jeff's contention Judge Vu abused his discretion by failing to, or refusing to, weigh relevant evidence. In contrast to the appellant in *Ritchie,* Jeff failed to cite to any *explicit statements* showing the court refused to consider the current circumstances.

C. *Legal Standard Applied*

In his reply brief, Jeff asserts the trial court failed to apply the correct legal standard. However, his supporting legal analysis closely resembles the argument set forth in his opening brief about the court refusing to weigh relevant evidence (which we have already ruled lacks merit). To the extent Jeff reframed the argument to assert the trial court applied the wrong legal standard, we reject it. In its minute order, and on the record, the court accurately recited the correct legal standard and appropriate factors to be considered in DVRO renewal cases. The court stated it reviewed all the facts before Judge Kelly and Judge Melzer "as well as the facts alleged from March 2018 to today." Jeff failed to demonstrate the trial court applied the wrong legal standard.

27

## D. *Relevance of DVRO Violations*

Jeff repetitively states, like a mantra, there was no "real" or "clear" evidence he violated the DVRO. This contention is both legally irrelevant and factually inaccurate. As mentioned, section 6345, subdivision (a), expressly states that a restraining order "may be renewed, upon the request of a party . . . without a showing of any further abuse since the issuance of the original order . . . ." Michelle testified the DVRO had proved to be effective despite her deteriorating relationship with Jeff. The *Ritchie* court explained: "It would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order. If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order." (*Ritchie, supra,* 115 Cal.App.4th at p. 1284.)

We recognize Jeff may be focused on the compliance issue because there are published cases holding a party's violation of the DVRO can support a finding of reasonable apprehension. (See *Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 875-876.) However, the reverse is not true. We found no cases holding compliance with a DVRO precludes a finding of reasonable apprehension. In any event, we have determined the record contains evidence Jeff was not completely compliant. For example, the DVRO forbid Jeff from drinking alcohol when the children were in his custody. After Michelle caught him violating this order, she filed an ex parte application. Jeff avoided a court ruling on the issue by volunteering to wear an alcohol monitoring bracelet. Two months later, the court ordered Jeff to stop tracking Michelle by using their children's iPhones. Nearly a year later, Judge Melzer concluded Michelle presented sufficient evidence to establish she held a reasonable apprehension Jeff was still tracking her movements using the children's iPhones.

In his briefing, Jeff denies he violated the court's orders regarding stalking, claiming he did not control his children's phones purchased by his mother. However, at

the renewal hearing he admitted he bought the children iPhones and he could turn off the tracking feature. Judge Vu could reasonably infer this was an unresolved issue further contributing to Michelle's fear of future harm. After all, Jeff lashed out and physically injured Michelle in response to her minor offense of emptying water from his cup. Michelle sought the DVRO because Jeff habitually responded to the slightest provocation with rage and violence. The record does not support Jeff's claim to have learned or applied new skills after participating in a batterer's intervention program, anger management counseling, or co-parenting counseling. One year after the court issued the DVRO, Michelle testified her therapist recommended she hide from Jeff if she obtained the move away order because Jeff was quick to anger and exhibited impulse control issues. Jeff could use the phone tracking feature as a passive aggressive means to gain power and control over Michelle because it prevented her from being able to hide from Jeff with the children. Jeff's misconduct supported the conclusion Michelle had a reasonable apprehension of future abuse if the DVRO was not renewed.

Moreover, contrary to Jeff's contention, his custodial and financial disputes were also relevant to the DVRO. Michelle aptly notes that support, restitution, child custody, and visitation orders can be made in domestic violence proceedings (§ 6321, 6324, 6325, 6340, 6341, 6342, & 6347). As was the case here, custody and financial disputes are often used by a restrained party as a pretext to continue harassing and controlling the protected party. Our record shows Jeff willfully violated multiple custody court orders[7] and strategized to financially starve Michelle and pressure her into terminating the DVRO. Judge Melzer's factual findings regarding Jeff's spiteful litigation tactics, including Jeff's appalling alliance with Michelle's abusive father,

---

[7]     For example, Jeff refused to pay court ordered child and spousal support, need based attorney fees, and custody evaluation costs. He helped his mother confiscate the family car and supported their eviction from the family home. He stopped communicating on Talking Parents and ignored custody exchange protocols.

29

demonstrated a high level of viciousness and malevolence towards Michelle. And although Jeff has had less contact with Michelle since she moved to Idaho, this change was not because they became cordial or resolved their differences.

In summary, Jeff's noncompliance with court orders further illustrates he has not moved on and the power and control dynamic of the abusive relationship is ongoing. Judge Vu reasonably believed Michelle's claim she was afraid of future abuse because of Jeff's hostility towards her remained unchanged. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823 ["The testimony of a single witness may provide sufficient evidence"].)

E. *Reliance on the Original DVRO*

Jeff's maintains the allegations supporting the original DVRO were trivial and could not possibly support its renewal. He downplays the seriousness of DVRO by asserting there was one "contested domestic violence incident" that did not involve the police or medical assistance. He offers the following one-sided, simplistic narrative of the incident that caused Michelle to seek a restraining order: "The parties had loaded guns in the house, but given their firearm experience, it was not considered a major factor. [Record citation.] Rather, and not to minimize the incident, but it was at its core a heated argument which got out of control. The trial court acknowledged Jeff was a good father and it granted him significant unsupervised visitation with the minor children." He maintained Michelle's willingness to co-parent with him and amend the DVRO proved she was never afraid of him.

In her respondent's brief, Michelle maintains this argument sounds like Jeff is erroneously challenging the underlying facts and findings of the trial court in support of the DVRO. We agree with this assessment. In his reply brief, Jeff claims he is not really challenging the original order. He recognizes he is "collaterally estopped from challenging the sufficiency of the evidence to support issuance of the initial restraining order." (*Martindale, supra,* 30 Cal.App.5th at p. 60.) He appreciates Judge Kelly did not

30

think it was a close call. Nevertheless, Jeff argues that because there was no history of excessive physical abuse or sexual assault, the "one incident of domestic violence" underlying the 2016 DVRO was insufficient to support a renewal three years later. In essence, he argues the abuse was not really that bad, especially when compared to other domestic violence cases. (Cf. *Rybolt, supra*, 20 Cal.App.5th 864; *Cueto v. Dozier* (2015) 241 Cal.App.4th 550.)

In making this argument, Jeff fails to understand the barrier credibility findings present on appeal. (See *Martindale, supra*, 30 Cal.App.5th at p. 61 [appellate court is required "to defer to the court's credibility determinations and make all reasonable inferences in support of the court's findings"].) Judge Kelly, Judge Melzer, and Judge Vu (as well as the unnamed dissolution judge deciding the property dispute) all concluded Michelle was a credible witness, but Jeff was not. They accepted all of Michelle's allegations as true and rejected Jeff's claim there was but one trivial incident of domestic violence. We must defer to the trial court's decision to accept Michelle's version of the extensive abuse she suffered, which combined with subsequent injurious events, amply supported the court's decision to renew the DVRO.

IV. *Motions to Strike*

Jeff moved to strike Michelle's reference and reliance on law review articles in her brief. We deny this request. It is well settled law review articles are not binding on this court. (See *People v. Wilcox* (2013) 217 Cal.App.4th 618, 626 ["[w]hile these materials can help inform us, they do not compel a particular result"].) Moreover, Jeff offers no legal authority precluding the use of law review articles in appellate briefing.

Michelle moved to strike new arguments raised for the first time in Jeff's reply brief. We deny this request because we have considered those arguments waived. (*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 976.)

31

## DISPOSITION

The order is affirmed. Appellant's and Respondent's motions to strike are denied. Respondent shall recover her costs on appeal.


                                        O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

Filed 8/31/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHELLE LEE ASHBY, | |
| Plaintiff and Respondent, | G058474 |
| v. | (Super. Ct. No. 16D006919) |
| JEFFREY BRYAN ASHBY, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Appellant. | |

The following legal organizations, associations, shelters, professors, and attorneys have requested that our opinion filed August 5, 2021, be certified for publication: (1) Family Violence Appellate Project and Jennafer Dorfman Wagner (attorney for Respondent); (2) Battered Women's Justice Project; (3) California Protective Parents Association; (4) Casa de Esperanza; (5) Child Abuse Forensic Institute; (6) Domestic Abuse Center; (7) Doves of Big Bear Valley, Inc.; (8) EndTAB; (9) FreeFrom; (10) The Law Foundation of Silicon Valley; (11) Los Angeles Center for Law and Justice; (12) MAITRI; (13) Public Counsel; (14) Shepherd's Door; (15) Stopping Domestic Violence; (16) Public Interest Law Project; (17) Walnut Avenue

1

Family & Women's Center; (18) Jeffrey L. Edleson, professor at University of California, Berkeley; and (19) Julie Saffren, lecturer at Santa Clara University School of Law, attorney, and editor of Domestic Violence Report newsletter. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

2