Filed 9/18/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LEO L. POPE et al., | |
|    Plaintiffs and Appellants, | G049629 |
|      v. | (Super. Ct. Nos. CIVSS813891, CIVDS904807) |
| MATTHEW BABICK, | |
|    Defendant and Appellant; | O P I N I O N |
| THOMAS STANLEY, | |
|    Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino County, John P. Vander Feer, Judge. Affirmed.

McCuneWright, David C. Wright and Michele M. Vercoski for Plaintiffs and Appellants.

Konoske Akiyama & Brust, Gregory P. Konoske and D. Amy Akiyama for Defendant and Appellant Matthew Babick.

Musick, Peeler & Garrett, Cheryl A. Orr, Scott L. MacDonald, David A. Tartaglio; Law Office of Mark S. Julius and Eric G. Bluemke, for Defendant and Respondent Thomas Stanley.

This case concerns a July 2008 motor vehicle accident on a freeway near Redlands. The vehicle occupied by plaintiffs Leo Pope and Judi Nightingale was hit by a vehicle driven by Debbie Sert, who is no longer a party. Plaintiffs proceeded to trial against Thomas Stanley, who they argued made a negligent lane change and caused Sert to hit plaintiffs' car, and Matthew Babick, the vehicle's owner. The jury found defendants not liable.

Plaintiffs offer two arguments on appeal. First, they assert there was not substantial evidence to support the verdict, a claim which we completely reject. Second, they argue the misconduct of Babick's attorney, Gregory Kane, was so egregious the court should have granted plaintiffs' request for a mistrial or motion for a new trial. Kane directly violated a court order by eliciting causation evidence from a California Highway Patrol officer who responded to the scene. Kane was subsequently sanctioned $500 and the jury was given a curative instruction. While we find Kane's behavior unacceptable from an officer of the court, we do not find the single question and answer on this subject was so prejudicial as to warrant a mistrial or new trial. We therefore affirm.

Babick filed a protective cross-appeal regarding the ownership of the vehicle Stanley was driving, but due to our decision on plaintiffs' appeal, we need not address it.

I

FACTS

As noted above, three vehicles are relevant in this accident. The first car, a 2000 Nissan Maxima, was driven by Sert, and she had three passengers, Lara Balit, Tamara Hacikian, and Nora Hacikian. They were on their way home from a weekend in Palm Springs, celebrating Sert's 19th birthday. On the night prior to the accident, they had stayed awake until 2:00 or 3:00 in the morning, waking in time to check out of their

2

hotel. Balit testified that she saw Sert drinking alcohol earlier in the weekend, but Sert did not have a clear recollection of doing so.

Sert had received her driver's license when she was 16. While in high school, her driving experience was mostly brief drives on surface streets to and from school. Once she graduated, she would drive home from college, from San Diego to Los Angeles, once or twice a month. Sert's father was concerned about her driving on the freeway, although she was not.

The second car was driven by plaintiffs, who were in a 2003 GMC Yukon. Pope, age 53 at the time, was driving, and Nightingale was his passenger. They were doing some errands shortly before the accident. Pope and Nightingale were a couple.

The third car, driven by 47-year-old Stanley, was a 1970 Oldsmobile convertible. He was accompanied by his partner, Fred Stanley. Stanley was taking the car to his brother, Babick, in Fresno.

As to the facts of the accident, it occurred on westbound Interstate 10 near the Ford Street off-ramp in Redlands. The westbound side of the freeway, the only portion relevant here, is composed of four lanes, which were relatively straight with a downhill grade. The freeway decreased to three lanes at the Ford Street off-ramp. At the time of the accident the weather was warm and clear, and the road was dry.

Sert testified that once she and her friends left Palm Springs, they began driving west on Interstate 10. Sert recalled the presence of a lot of cars on the freeway, but said she was able to drive at a "good speed." She remembered driving in the number one lane,[1] though she was not sure for how long, and she changed lanes more than once. Sert was driving at approximately 70 to 75 miles per hour. The speed limit was 65.

---

[1] Lanes are numbered from left to right. Therefore, the furthest left lane in a given direction, sometimes known as the fast lane, is the number one lane. The next lane over is number two, and so forth.

Plaintiffs entered the freeway at Yucaipa Boulevard, and Pope testified he was driving about 65 miles per hour and did not have to slow for traffic. Stanley entered the 10 freeway from Highway 111, and described traffic as moderate, allowing him to drive about 65 miles per hour.

The basic facts regarding the accident were reflected in the California Highway Patrol (CHP) report prepared by Officer Michael Earl, who responded to the scene with Officer Raul Arriaga. Sert's vehicle was traveling in one of the left-hand lanes. Only Sert herself told the police she was not changing lanes. Balit said she had changed lanes and was completely in the new lane; Tamara Hacikian said Sert had changed lanes, and Nora Hacikian said Sert "began to change lanes into the #2 lane at the same time a vehicle in the #3 lane began to change lanes into the #2 lane."

Stanley's vehicle, from the right, began to change lanes into Sert's lane. Sert attempted to avoid him, and in doing so, tried to swerve to her left, but to avoid another car, she swerved back to her right. She lost control of the vehicle, which began to spin and flipped over, at some point impacting plaintiffs' vehicle and causing it to flip. Stanley's vehicle was not involved in the impact, and he did not stop at the scene.

In preparing the report, Earl spoke to Sert and her passengers, plaintiffs, and Brad Gorham, another driver who witnessed the accident. Gorham said Stanley's vehicle was "going kind of fast" and changing lanes through traffic. He was not sure where Sert's vehicle was, and then Stanley's vehicle "possibly went into the lane that was occupied by another vehicle or was trying to change into that lane. It happened so fast he isn't quite sure what happened." Gorham got Stanley's license plate number and reported it to the police; Gorham also felt that Stanley should have stopped after the accident. Ultimately, the report concluded that Sert caused the accident by making an unsafe lane change.

In October 2008, plaintiffs filed the instant lawsuit. In due course, both plaintiffs settled with Sert. Before trial began in October 2011, the court ruled on a

4

number of motions in limine. One such motion was plaintiffs' motion to exclude the testimony of Earl and Arriaga regarding their conclusions as to the cause of the accident, the crash sequence, what caused the rollover, or the vehicle's structural integrity. The court granted the motion with respect to causation issues, absent laying a proper foundation, which would be discussed outside the jury's presence.

The jury was then empanelled and preinstructed prior to opening statements. Among other things, they were directed to reach a verdict based on the evidence, keep an open mind, and not to decide the case until they had heard all the evidence and discussed it as a jury. We set forth the testimony adduced at trial in accordance with the relevant standard of review.

Balit testified that Sert was driving in the number one lane and fully and safely moved to the number two lane. About two minutes later, Balit saw a Mustang-like car changing lines behind Sert's car, then again to the right. In the mirror, she saw another car coming closer. The police report reflected she said she believed they might be in the Ford's blind spot, but at trial she did not recall saying that. She saw the vehicle moving into their lane and called out to Sert.

Sert testified that about 10 minutes prior to the accident, she had not changed lanes. She was in the number one lane and changed to the number two lane. She estimated she had been in the lane for 10 seconds and had traveled five to six car lengths before she saw Stanley's car. She said she saw Stanley's car outside the front passenger window, but also testified she could see the car right next to the front tire of her own car.

Gorham testified that he saw Stanley's car ahead of him in the same lane. He also saw the Nissan about 300 yards away in the number one lane. He was approximately 100 to 200 yards away when he saw Stanley's car moving. He testified: "It appeared that one of the cars, it tried to change lanes into the other. And I don't know if it was the convertible trying to change lanes into the left to go into the other car or vice

5

versa or the other car going into the other. I just can't recall what it was, but I could see movement as like swerving of the cars." Ultimately, however, he did not know who caused the accident.

For his part, Stanley testified that he did not see Sert's vehicle fully occupying the number two lane, and he would not have changed lanes if it was unsafe. His habit was to check to see whether a lane is empty, signal, use his mirrors, and look over his shoulder.

He stated it was true that he started his transition without realizing Sert's car was there. He had looked over his shoulder and saw a car that was two to three car lengths behind, transitioning from the number one to number two lane, and he believed the car would be behind him. He then saw the vehicle, Sert's car, come up behind him at a high rate of speed transitioning from the number one to number two lane, cross in front of him and eventually hit plaintiffs' car. The accident occurred ahead of him and to his right. He was shocked, but did not stop because he was not involved in the accident and did not believe he did anything wrong.

Stanley's partner, Fred Stanley, testified similarly. He saw a car speeding on their left, crossing in front of them, and hitting a vehicle on the right. For his part, Pope saw very little, though he heard the screeching of tires. The impact was to the left rear of his vehicle. He did not see Stanley's vehicle. Nightingale, too, did not see the events leading to the accident.

During Earl's testimony, he was being questioned by Kane, Babick's counsel. He began by asking about Earl's investigation of alcohol use among Sert and her friends. He then asked:

"Q: Did you come to the conclusion as to how this accident occurred?

"A: Yes. Based on my investigation, yes.

"Q: Did you put those in your report?

"A: My findings, yes.

6

"Q: And your conclusions as far as cause of the accident?

"A: Yes, I did.

"Q: And what were your conclusions?

"A: I concluded that Debbie Sert made an unsafe lane change."

At that point, plaintiffs' counsel objected. The testimony was stricken and the court instructed the jury they were not to consider Earl's conclusion as to the cause of the accident, but to make their own determination. Plaintiffs' counsel subsequently requested a mistrial. Kane explained he got carried away when asking about the alcohol use, and did not think Earl would offer accident reconstruction testimony. The court denied the motion and ordered counsel to formulate a jury instruction.

Counsel did so and the following instruction was given: "Ladies and gentlemen of the jury, you have heard testimony from Officer Michael Earl regarding his opinion as to the cause of the automobile collision. Prior to the start of this trial, I determined that Officer Earl did not have the training or qualifications to offer an opinion as to the causation of the subject accident. [¶] And the parties were instructed by me not to ask him questions about his opinions. Yesterday counsel for Defendant Babick violated my order, so I'm providing you with further instruction about Officer Earl's testimony. [¶] I have determined that Officer Earl's opinion and conclusions as to the cause of the automobile collision are not admissible and cannot be considered by you in determining who is legally responsible for the damages to Plaintiffs. That portion of Officer Earl's testimony has been removed from the record and I am instructing you that you are not to consider or rely upon Officer Earl's opinions or conclusions as to the cause of the automobile collision."

Harry Krueper was the plaintiffs' accident evaluation expert. He was asked to evaluate what he felt were the factors that caused the accident to occur. He reviewed the police report, the area itself, the photographs of tire marks on the pavement, and the movement of traffic in the area. He also reviewed depositions, including that of Nora

Hacikian, who did not testify at trial. Kreuper's testimony pointed out some problems with the CHP report, including a miscount of the number of lanes at the accident site.

Kreuper's conclusions were limited to the available evidence, which was incomplete, particularly with respect to the speeds the vehicles were traveling. With respect to the movement of Sert's car, there were indications that Sert turned the wheel to the right before she lost control of the car, but not to the left, based on the tire marks. In his opinion, Sert had overreacted, due to her age and inexperience.

The jury deliberated for the better part of three days. On the third day, the jury requested reading back Gorham's testimony. Later that same day, the jury returned a unanimous verdict finding Stanley not negligent.

In February 2012, the court denied plaintiffs' new trial motion. Plaintiffs now appeal.

II

DISCUSSION

*A. Substantial Evidence*

Plaintiffs argue that under the substantial evidence standard, the finding of no negligence on Stanley's part must be reversed. For example, they argue: "[T]here is substantial evidence to support a finding that Stanley unreasonably began to change lanes without first checking whether it was safe to proceed . . . ." But this attempts to turn the standard of review on its head. We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party. Thus, we *only* look at the evidence offered in Stanley's favor and determine if it was sufficient.

As has been said many times and by many courts, when the "findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.

8

[Citation.]" (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.) "In applying this standard of review, we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) We do not reweigh evidence or reassess the credibility of witnesses. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.) We are "not a second trier of fact . . . ." (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.) A party "raising a claim of insufficiency of the evidence assumes a 'daunting burden.' [Citation.]" (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678.)

Moreover, when a losing party challenges the verdict for a lack of substantial evidence, they "must set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable*. [Citation.]" (Italics added.) (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) Appellants' "fundamental obligation to this court, and a prerequisite to our consideration of their challenge" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738), is to "set forth the version of events *most favorable to* [*respondent*]" (*id.* at pp. 737-738, italics added). "Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

Plaintiffs have failed in this obligation. The facts in their briefs, particularly their opening brief, are focused almost entirely on setting forth their version of events. They limit the discussion of testimony to only statements in their favor; they fail to mention entirely, for example, the testimony of plaintiffs' own expert witness.

9

They use unhelpful subheadings such as "Defendant Stanley's Flight from the Accident Scene," "Debbie Sert's Trial Testimony Regarding Defendant Thomas Stanley's Negligence" and "Lara Balit's Trial Testimony Regarding Defendant Thomas Stanley's Negligence." (Boldface omitted.) They fail to discuss any factor other than Stanley that might reasonably have been relevant.

Thus, while we could properly deem any issue of substantial evidence waived, we address it on the merits in the interests of justice under the proper standard of review. We therefore examine only the evidence in support of the judgment to determine whether it was substantial enough to support the jury's verdict.

Under the relevant standard of review, we need not belabor this issue in any great detail. The jury was free to believe Stanley's version over Sert's and Balit's. While plaintiffs seem to think Stanley's testimony that he did not see Sert's car before he changed lanes as some sort of smoking gun, it was not anything of the sort when considered in light of Stanley's entire testimony, which plaintiffs conveniently omitted from their briefing. Stanley testified Sert's car was behind him, transitioning from the number one to the number two lane, and he believed it was going to stay behind him. The car then sped up, crossed in front of him, and hit the car on his right (plaintiffs' car). In short, Stanley's version of events was not that Sert's car was fully in the number two lane when he started to make his lane change, but was transitioning behind him and then sped up, passing him, crossing in front, and eventually hitting plaintiffs' car.

Plaintiffs also believe Gorham's testimony was crucial, but ultimately it was not. He saw swerving, but ultimately, he did not know who caused the accident. Moreover, Krueper, plaintiffs' own expert, testified he believed Sert had overreacted due to her age and inexperience.

As the jury was instructed, "the testimony of a single witness is enough to prove a fact." The jury was also told it could find a witness not to be credible, and the sheer volume of evidence presented by one side was not determinative.

10

Thus, the jury was free to believe Stanley's perfectly credible story, and to reject Sert's version. It was logical for the jury to believe, given all of the relevant evidence, that Sert, a young, inexperienced driver with three passengers in the car on the way home from a party weekend, overreacted to other drivers and therefore caused the accident. We have no trouble finding the jury's verdict was supported by substantial evidence.

## B. Attorney Misconduct

Plaintiffs' remaining argument in this case is the unquestioned misconduct of Babick's attorney, Gregory Kane, who improperly elicited the excluded testimony from Earl regarding his conclusions about the cause of the accident. They argue that either their motion for mistrial or their motion for new trial should have been granted on that basis.

To begin, we disapprove of Kane's actions in the strongest possible terms. He disregarded a court order, and this court neither appreciates nor accepts counsel's inapt and inept attempts during oral argument to minimize Kane's misconduct. "As an officer of the court, [counsel] owes a duty of respect for the court." (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1374.) Defying a court's order is "outrageous misconduct." (*Ibid.*) Whether that conduct requires reversal, however, is a separate question we must consider in light of the procedural posture of the challenged orders and the relevant law.

### 1. Motion for Mistrial

We review a motion for mistrial for abuse of discretion. "'A trial court should *grant* a mistrial *only* when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling *denying* a mistrial.' [Citations.] [Fn. omiited.]" (*Blumenthal v.*

*Superior Court* (2006) 137 Cal.App.4th 672, 679.) "[T]he trial judge, present on the scene, is obviously the best judge of whether any error was so *prejudicial to one of the parties* as to warrant scrapping proceedings up to that point." (*Id.* at p. 678.)

"'The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria. "The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion."'" [Citation.]" (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089.)

Knowing the reasons for the court's decision is not a prerequisite to determining whether an abuse of discretion occurred, but it can be extremely helpful. We have an excellent record in this case with respect to plaintiffs' motion for mistrial, and we commend the trial court for providing it. In denying the motion, the court explained: "There's a lot of problems with the CHP officers' reports, as you pointed out as far as the lane change, not contacting witnesses, so if this was an officer that may have followed up and did everything they were supposed to do . . . your own expert i[s] going to testify they didn't measure things correctly, correct?" Plaintiffs' counsel confirmed this was the case. The court continued: "And Mr. [Kreuper] is going to say that these measurements don't really measure up, something like that." Again, counsel essentially agreed.

The court then explained: "And so in that extent, [Earl's] conclusions saying I believe Ms. Sert is responsible has less impact than maybe somebody that didn't do these things . . . handled the approach without some of these, as you indicated, missteps or errors. So I don't know that it's as significant as you indicate. . . . [¶] But I think these individual officers remember nothing hardly of this incident, and they're just reading from the report, so I don't think the impact of it is as severe as you'[v]e indicated

12

or you believe. [¶] So I'm going to deny the motion for mistrial." At that point, the court directed counsel to prepare the instruction we quoted above.

In terms of acting within the permissible range of options set by the legal criteria (see *Bank of America, N.A. v. Superior, supra*, 212 Cal.App.4th at p. 1089) we find the court acted appropriately here. The court had a number of options before it, including granting the motion for mistrial or admonishing the jury. The court chose to admonish the jury, basing its decision partly on the expected testimony of plaintiffs' expert regarding the overall handling of the investigation, which it believed would eliminate any realistic possibility of prejudice once the curative instruction was given.

"The fundamental idea of a mistrial is that some *error* has occurred which is too serious to be corrected, and therefore the trial must be terminated, so that proceedings can begin again. [Citation.]" (*Blumenthal v. Superior Court, supra*, 137 Cal.App.4th at p. 678.) We cannot conclude that the court erred in deciding an alternate course of action was appropriate. In addition to the natural benefit the court had of actually observing what happened in the courtroom, it made a reasoned decision based on legally permissible criteria. Therefore, it did not abuse its discretion by denying the motion.

### 2. *Motion for New Trial*

At the conclusion of proceedings, plaintiffs moved for a new trial, primarily on the grounds of Kane's misconduct. The court denied the motion. Neither party requested a transcript of the argument, during which the court presumably discussed its reasons. "[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal. [Citations.]" (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) But when attorney misconduct is at issue, we must independently consider whether the misconduct resulted in prejudice. Prejudice exists if it is reasonably probable that the jury would have arrived

13

at a verdict more favorable to the moving party in the absence of the irregularity or error. (*Ibid.*)

Attorney misconduct is valid grounds for a new trial. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148.) There is no question that misconduct occurred here; the only question is whether it resulted in prejudice.

A similar case is helpful in this respect. In *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, which also involved an auto accident, plaintiff's counsel told the jury during opening statements that the investigating officer would express the opinion that the accident was defendant's fault, specifically, whether she had made an unsafe left turn. (*Id.* at p. 207.) Plaintiff had been riding a motorcycle. (*Id.* at p. 204.) Following opening statements, plaintiff moved in limine to exclude the officer's opinion. The court ultimately ruled that without a proper foundation, the officer was not to be questioned about his opinion as to cause. (*Id.* at pp. 207-208.) Plaintiff called the officer as a witness and asked him whether he formed an opinion as to whether defendant made an unsafe left turn. The court sustained the defense's objection. (*Id.* at p. 208.)

Later, when called as a defense witness, plaintiff's counsel asked a series of questions regarding whether the motorcycle presented a hazard to defendant's vehicle. The officer was also asked: "'Officer, why do you feel that the accident occurred?'" Each objection was sustained. (*Dominguez v. Pantalone*, *supra*, 212 Cal.App.3d at pp. 208-209.) Plaintiff's counsel again persisted: "'Let me ask you, is it your duty to form an opinion —'" The court interrupted: "'I tell you what his duty is here, and is not to go to the ultimate fact. That is the jurors' function, and let's not keep asking the same questions, because I am going to tell you again, no. He wasn't there. He took statements.'" (*Id.* at p. 209.) Plaintiff's counsel then attempted to introduce the officer's opinion through the testimony of an expert witness. (*Ibid.*) At that point, defense counsel requested a mistrial. (*Ibid.*) The court denied the mistrial, but issued an instruction to the jury on the inadmissibility of the officer's opinion. (*Id.* at pp. 209-210.)

14

The Court of Appeal held the admonition was sufficient. (*Dominguez v. Pantalone*, *supra*, 212 Cal.App.3d at p. 212.) The court noted that prejudicial error occurs only when jury instructions cannot serve to remove the effect or "'*cure the evil.*'" (*Id.* at p. 210.) In assessing prejudice, the court must consider a number of factors, including the record as a whole, the likelihood of jury prejudice, and the efficacy of the admonition. (*Id.* at p. 212.)

Unlike the situation in *Dominguez,* where counsel attempted to introduce excluded evidence on multiple occasions, at different times and through two witnesses, the misconduct here was one question, on a single occasion. The jury was told in no uncertain terms that Earl's testimony on this point was excluded and to be disregarded. The instruction fashioned was strong and clear on this point, and we find it was sufficient to remedy Kane's single, though nonetheless inexcusable, instance of misconduct.

Absent some indication in the record, we presume the jury followed the court's instructions and that its verdict reflects the limitations the instructions imposed. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804; *People v. Bradford* (1997) 15 Cal.4th 1229, 1337.) While plaintiffs assert that Earl's statement was "highly prejudicial," and could not be cured by the admonition, this is a conclusion, not evidence or argument. We have no evidence here the jury did not follow the instructions given.

Further, given the entirety of the record here, we simply cannot find prejudice sufficient to warrant reversal. By the time it considered the new trial motion, the court had the entire trial upon which to reflect. Plaintiffs' argument on this point boils down to the claim that the only way the jury could have found in Stanley's favor was to place so much weight on Earl's excluded statement that it outweighed everything else. We must disagree. The trial included some highly damaging evidence to plaintiffs, including the statement by their own expert that Sert had overreacted due to her age and inexperience. We therefore do not find it was reasonably probable the jury would have arrived at a verdict more favorable to plaintiffs in the absence of Earl's answer. (*City of*

15

*Los Angeles v. Decker*, *supra*, 18 Cal.3d at pp. 871-872.) If we were persuaded this was not a fair trial, we might reach a different result. But we are informed by the trial judge's view the trial was indeed fair, and we must agree that a single impermissible question and answer is not sufficient to override the judge's instructions and the remainder of the proceedings.

Once again, we strongly disapprove of Kane's behavior. If it were up to us, he would have been sanctioned far more than $500. But the law is the law, and we must follow the relevant legal standards. Based on those standards, the trial court did not err by denying either of plaintiffs' motions. By stating our position in a published opinion, we believe we have satisfied our obligation to take appropriate corrective action as required by Canon 3D(2) of the California Code of Judicial Ethics.

## III

## DISPOSITION

The judgment is affirmed. In the interests of justice, each party is to bear its own costs on appeal. Given our decision on the appeal, we need not address Babick's cross-appeal.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

16