Filed 5/22/24  Marriage of Filipp CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re the Marriage of KRISTI and FABIAN FILIPP. | |
| | D081437 |
| FABIAN VOLKER FILIPP, | |
| Appellant, | (Super. Ct. No. 19FL014075C) |
| v. | |
| KRISTI FILIPP, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Victor N. Pippins, Judge.  Affirmed.

Fabian Volker Filipp, in pro. per., for Appellant.

No appearance for Respondent.

Fabian Volker Filipp appeals from the trial court's October 25, 2022 order (October 25 Order) invalidating the postnuptial property agreement (Agreement) between Fabian[1] and respondent Kristi Filipp.[2]  In this

---

1     We use the parties' first names for clarity, intending no disrespect.

appeal,[3] Fabian claims the court erred as a matter of law by placing the burden on him to overcome the statutory presumption of undue influence, after finding the Agreement gave him a "clear advantage" over Kristi by depriving her of community property assets including to his income, retirement funds, and real property.  He also claims that even if it was his burden, he rebutted the presumption based on evidence the Agreement purportedly was mutually beneficial to both spouses and Kristi knowingly and voluntarily consented to it.

Viewing the evidence in the light most favorable to the trial court's October 25 Order, we conclude substantial evidence supports the finding that Fabian obtained a "clear advantage" over Kristi under the Agreement, thereby placing the burden on him to rebut the presumption of undue influence under Family Code[4] section 721, subdivision (b).  We further conclude substantial evidence supports the finding he did not rebut the presumption, as the evidence credited by the court shows the Agreement was not mutually beneficial to both spouses, and Kristi did not freely and voluntarily enter into it with full knowledge of the facts and a complete

---

[2]     Kristi did not file a respondent's brief.  Nonetheless, as the appellant, Fabian bears the affirmative burden to show error; we therefore will " 'examine the record and reverse only if prejudicial error is found.' " (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078; accord, *In re Bryce C.* (1995) 12 Cal.4th 226, 232–233 ["Although some courts have treated the failure to file a respondent's brief as in effect a consent to a reversal, . . . the 'better rule . . . is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found.' "].)

[3]     Fabian obtained a certificate of probable cause for appeal following the bifurcated trial.  We subsequently granted his motion to appeal the trial court's October 25 Order.

[4]     All further undesignated statutory references are to the Family Code.

2

understanding of its effects.  We thus affirm the October 25 Order invalidating the Agreement.

## I.

## AUGMENTATION OF THE RECORD

Initially, we address Fabian's two requests to augment the record.

By way of background, Fabian filed his proposed settled statement in early March 2023, as the trial regarding the enforceability of the Agreement was unreported.  Later that month, Kristi filed her own proposed settled statement, to which he objected.  In April, the trial court issued an order adopting and certifying, with minor modifications, Kristi's settled statement.

In June 2023, Fabian moved for reconsideration of the trial court's ruling, claiming Kristi's settled statement was inaccurate.  In support, he lodged a new proposed settled statement accompanied by a 128-page "transcript" that appears to have been prepared verbatim from the unreported trial.  He requested that the court certify his new proposed settled statement for use in this appeal in lieu of the one it had certified in April.

In early July 2023, Fabian filed a motion to augment the record while his motion to reconsider the certified settled statement was pending in the trial court.  Attached to his motion were various documents regarding the parties' dispute over the settled statement, including his proposed new settled statement and the 128-page "transcript" in support.  The following month, Fabian filed a second motion to augment the record.  We subsequently issued orders stating his two augmentation motions would be "considered currently with the appeal."

In mid-November 2023, Kristi objected to Fabian's motion(s) to augment and separately requested augmentation of the record to include the September 13, 2023 order *denying* Fabian's request to reconsider the settled

3

statement. In its September 13 order, the court found it to "hard to believe" that Fabian did "not tape the [enforceability] proceedings," admonishing him that the surreptitious recording of court proceedings is forbidden.[5]

In early December 2023, Fabian filed a motion to "dismiss[ ]" Kristi's objection to his motion(s) to augment.

As noted by our previous orders, Fabian's July and August motions to augment the record were deferred to this panel.[6] We now *deny* both motions based on the trial court's September 13 order refusing to reconsider the settled statement it certified in April 2023. (See *Marks v. Superior Court* (2002) 27 Cal.4th 176, 195 [trial court has " 'full and complete power' " to make a final determination of the content of the settled statement]; *Sidebotham v. Superior Court* (1958) 161 Cal.App.2d 624, 628 [appellate court has "no familiarity with the oral proceedings" from the trial court and therefore has no basis to "measure the adequacy or inadequacy" of the settled statement].)

---

[5] On our own motion, we take judicial notice of the trial court's September 13 order pursuant to Evidence Code section 452, subdivision (d), which provides that judicial notice may be taken of "[r]ecords of (1) any court of this state."

[6] In his December "dismissal" motion, Fabian incorrectly states that we *granted* his August motion to "include post-judgment documents filed in the superior court." However, our orders unambiguously stated that both of his augmentation motions, and the subsequent related filings, would be "considered concurrently with the appeal."

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[7]

Kristi and Fabian married in April 2014[8] and separated in July 2019. They had two children during their marriage, a son born in June 2014 and a daughter born in April 2016. Kristi filed a petition for dissolution of marriage in November 2019.

A. *Kristi's Testimony*

Kristi first learned of Fabian's desire to enter into a postnuptial property agreement on March 23, 2015, when Fabian called her at work and asked that they meet at his attorney's office over her lunch hour to " 'quickly' " sign " 'some legal documents' " that he claimed were " 'no big deal.' " At the time the couple were living in Merced, California. Fabian's attorney, Stuart Spencer, presented Kristi with the proposed postnuptial agreement, with a notary on standby.

Kristi was "upset by the circumstances" of the March 23 meeting. She did not understand "much of the agreement" and felt "pressured" to sign. At some point she met with Spencer alone. Because she was crying and upset, Spencer advised her not to sign that day. During their meeting, Spencer did not explain community property law or the rights she was giving up under the proposed agreement. He also did not review any of the financial disclosures. However, he did advise her to consult with an attorney. Kristi

---

[7]    "On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

[8]    Kristi and Fabian were legally married in a "courthouse" wedding after she had become pregnant.

5

responded that they were leaving for their wedding celebration in three days and that she had neither the funds nor the time to meet with an attorney.

Once home, Kristi and Fabian discussed the proposed postnuptial agreement. Kristi was particularly concerned about the provisions regarding her right to share in Fabian's estate, since they had a young child. Fabian "reassured" her the proposed agreement purportedly "did not harm her property rights" and "only represented an accounting of the property they came into the marriage with."

They also discussed their wedding celebration in San Diego on April 4, 2015. Kristi alone had planned it, spending "thousands of dollars" of her own money. Although they had many friends and family attending, Fabian threatened not to "go forward" with the celebration unless she signed the proposed agreement. Kristi relented, and Fabian e-mailed Spencer on March 24 stating they would be at his office the following day to sign.

When Kristi signed the Agreement on March 25, she did not "underst[and] the concept of community property" or that she was giving up her "community property share of reimbursement for the homes owned by Fabian prior to the marriage, her community property share of the home purchased during the marriage, her community property share of Fabian's income, so long as he deposited [it] into his separate account, and the increases to Fabian's retirement accounts during the marriage."

Kristi was also unaware that in June 2014 Fabian had purchased real property located at E. 27th Street in Merced (Merced Property). He made the purchase just after she had given birth to their first child. She never would have signed the Agreement had she known she was giving up her share of community property in the Merced Property.

B. *Fabian's Testimony*

Fabian alone met with Spencer in early January 2015. Fabian then discussed the need for a postnuptial agreement with Kristi a few days later, stating it needed to be done before their "April 4 vow renewal date." That same month they opened a joint checking account which he funded. Kristi reimbursed herself from that account for purchases she made from her separate property account.

Between January and March 2015, Kristi and Fabian used their "professional email accounts" to send each other information concerning the proposed agreement. However, these e-mails were no longer accessible by either party. Kristi also received e-mails directly from Spencer before she signed the Agreement, including "early draft[s]" of the proposed agreement.

Kristi was "emotional" during the March 23 meeting at Spencer's office. Fabian was supportive and made sure all of her questions were answered. It was never his intention that she waive essential rights of "survivorship," as the "goal" of the Agreement was to "facilitate a future estate plan and to separate assets in case of divorce."

Fabian purchased the Merced Property before he and Kristi married, but the deed was not executed and recorded until after their marriage due to a "complicated signing process." He told Kristi he would not go forward with the April 4 wedding celebration if she refused to sign the Agreement.

At the time of trial, Fabian still owned the four properties disclosed in Exhibit A attached to the Agreement, although he transferred three of them into separate property trusts in 2019 without informing Kristi.[9] He purchased a fifth property in San Diego in March 2021. He denied using community funds to purchase that property.

---

[9] The fourth property was located in Heidelberg, Germany.

C. *Spencer's Testimony*

Spencer met with Fabian in January 2015 to discuss a postnuptial property agreement. Over the next few months he received information from Fabian regarding the parties' assets. Kristi was copied on e-mails between Spencer and Fabian on March 24, one day before they signed the Agreement. Spencer confirmed the e-mails that included Kristi "began" that day, and he had no record of any previous communications with her.

Spencer met with Kristi alone on March 23. Because she was crying and upset, he advised her not to sign that day. They talked about changes she wanted to provisions regarding Fabian's estate, and he reviewed "parts" of the Agreement until she no longer could continue. During their meeting Spencer advised her that he represented Fabian only, recommended she consult with her own attorney, which provision he included in the Agreement, and denied giving her legal advice or explaining the meaning of each paragraph of the Agreement.

Spencer received e-mails from Fabian on March 24, with copies to Kristi. Spencer took these e-mails to mean that the parties had come to a "full agreement" and therefore "no further independent review with Kristi was necessary." Had he known she did not understand the content of the Agreement, he would not have proceeded with signatures.

D. *The Trial Court's Ruling*

After taking the matter under submission, the trial court ruled the Agreement was "unenforceable and invalid[ ]." It found Fabian received a "clear advantage" under the Agreement by depriving Kristi of "assets that would otherwise be hers under a community property analysis." Because the statutory presumption of undue influence applied, it further found Fabian

8

had the burden of rebutting that presumption, and that he did not meet this burden.

The trial court found Kristi's testimony "regarding the chronology of the preparation" of the Agreement "more credible" than Fabian's; that no evidence supported his claim that Kristi was involved in the drafting of the Agreement or "aided in its preparation"; that the weight of the evidence supported her claim that she "first heard of the agreement when [Fabian] called on her lunch break on March 23, 2015, to sign the agreement"; and that while she waited two days to sign and was able to add terms, "she did so under the threat that her wedding ceremony would not go forward if she did not sign. Even [Fabian] testified at trial that he was not sure if he would go f[or]ward with the ceremony had [Kristi] refused to sign the agreement."

The trial court also found that Kristi "did not have a full understanding of what community assets existed at the time of the agreement"; that her purported waiver of rights to those assets was "not knowing or voluntary"; and that the documents she lodged with the court regarding the Merced Property showed Fabian acquired it during their marriage.[10]

III.

DISCUSSION

A. *The Agreement Advantaged Fabian over Kristi, Creating a Presumption of Undue Influence*

Fabian claims the trial court erred as a matter of law by placing the burden on him to rebut the presumption of undue influence. We disagree.

---

[10] In making this particular finding, the trial court noted it was unnecessary to determine the character of the Merced Property, which it would take up at a later proceeding.

9

1. Guiding Principles

Spouses have the right to enter into transactions with each other as well as other persons. (§ 721, subd. (a).) However, interspousal transactions must comport with the rules controlling the actions of persons occupying confidential roles with each other. (*Id.*, subd. (b).) Section 721, subdivision (b), provides in part: "[I]n transactions between themselves, spouses are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." (*Ibid.*)

Our decision in *In re Marriage of Haines* (1995) 33 Cal.App.4th 277 (*Haines*), questioned on another point in *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1404, provides meaningful guidance regarding interspousal agreements and the interpretation of section 721, subdivision (b). In *Haines*, the wife asked her husband to co-sign a loan to enable her to purchase a car. (*Id.* at p. 284.) On the way to sign the loan, the husband stopped at a store that had a notary service; demanded that the wife sign a quitclaim deed returning ownership of the family home, which he and his former wife had occupied, to him; and stated "if she did not sign the quitclaim deed he would not co-sign the automobile loan." (*Ibid.*) Believing she had no alternative, the wife signed the quitclaim deed under considerable emotional and physical duress, conveying her joint interest in the residence to her husband as his separate property. (*Ibid.*) The wife testified she did not know that her husband intended to stop at the store on their way to the bank. (*Ibid.*)

The husband refuted his wife's version of events, characterizing the transaction between them as "calm and businesslike." (*Haines, supra*,

10

33 Cal.App.4th at p. 284.) He denied conditioning his co-signing the automobile loan on his wife's signing the quitclaim deed. (*Id.* at p. 285.) During a period of reconciliation, the husband signed a grant deed conveying the house back to himself and her as joint tenants. (*Ibid.*) Ultimately, the marriage failed.

In the division of property, the trial court found the residence was community property by virtue of the grant deed conveying the property to husband and wife as joint tenants. (*Haines, supra*, 33 Cal.App.4th at p. 285.) However, it also found that when the husband executed the grant deed, the residence was his separate property, and therefore he was entitled to reimbursement for his separate property contribution; and that the wife did not meet her burden by clear and convincing evidence under Evidence Code section 662[11] in her attempt to set aside the quitclaim deed based on "undue influence, duress, deceit, and constructive fraud[.]" (*Id.* at p. 286.) However, in making its ruling the court found the wife had met the lesser evidentiary standard of preponderance of the evidence regarding her claims. (*Ibid.*)

Applying community property law, we concluded in *Haines* that "because spouses occupy confidential relations with each other, when an interspousal transaction advantages one spouse over the other, a presumption of undue influence arises" (*Haines, supra*, 33 Cal.App.4th at p. 287, citing § 721, subd. (b)); that the public policy of this state "demands" that a husband and wife "deal fairly with each other" (*Haines*, at p. 287); that although spouses have the right to enter into transactions with each other (§ 721, subd. (a)), interspousal transactions "must comport with the rules controlling the actions of persons occupying confidential relations with each

[11] Evidence Code section 662 provides: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."

11

other" (*Haines*, at p. 293, citing § 721, subd. (b)); and that in such circumstances, "the competence of spouses to engage in transactions with each other is subject to the circumstances being pleasing to the fiduciary standard" (*Haines*, at p. 293; accord, *Estate of Cover* (1922) 188 Cal. 133, 143–144 (*Cover*) ["It is the rule in this state that transactions between husband and wife shall be subjected to the general rule which controls the actions of persons occupying confidential relations with each other, . . . which, when applied to the relation of husband and wife, had been interpreted to mean that 'in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption.' "]; *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 88 (*Baltins*) ["[W]here one spouse admittedly secures an advantage over the other, the confidential relationship will bring into operation a presumption of the use and abuse of that relationship by the spouse obtaining the advantage."]).

We also concluded that when the wife transferred her interest in real property to her husband for his co-signature on the automobile loan, she "clearly" received "inadequate consideration," thus placing the burden on him to rebut the presumption of undue influence before the quitclaim deed could be confirmed. (*Haines, supra*, 33 Cal.App.4th at p. 296.) "To demonstrate the advantage was not gained in violation of the confidential relation between marital partners, [the husband's] burden properly should have been to prove the quitclaim deed 'was freely and voluntarily made, and with a full knowledge of all the facts, and with a complete understanding of the effect of the transfer.' " (*Ibid.*, quoting *Brown v. Canadian Indus. Alcohol Co.* (1930) 209 Cal. 596, 598.) Because the wife successfully proved "by a preponderance

12

of the evidence" a number of her defenses to the validity of the quitclaim deed, including duress, constructive fraud, and breach of fiduciary duty, we set aside the quitclaim deed and reversed that portion of the judgment awarding the husband reimbursement for his separate property contribution. (*Haines*, at p. 302.)

2. Analysis

Here, the trial court found Fabian obtained a "clear advantage" over Kristi under the terms of the Agreement, as Kristi gave up her community property rights to his salary, retirement funds, and real property—including the Merced Property that he acquired during their marriage and held as a "single man."

When " 'findings of fact are challenged in a civil appeal, we are bound by the familiar principle that "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]' " (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245 (*Pope*).) " '[W]e resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the [trier of fact's] findings and the verdict." ' [Citation.] We do not reweigh the evidence or judge the credibility of witnesses." (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251 (*Mathews*).) A party "raising a claim of insufficiency of the evidence assumes a 'daunting burden.' [Citation.]" (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678.)

We conclude substantial evidence supports the trial court's finding that the Agreement disadvantaged Kristi. (See *Pope, supra*, 229 Cal.App.4th at p. 1245; accord, *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1355 [whether an interspousal agreement has been procured by undue influence is a question of

13

fact that must be determined by the court or jury sitting as trier of fact from all the facts and circumstances].)

Under the Agreement, the parties' earnings during marriage remained their separate property unless they chose to deposit the money into a joint checking account.[12] As the main wage earner, this provision advantaged Fabian over Kristi; to the extent he deposited his earnings into his separate property bank accounts, retirement accounts, or used them to pay expenses on his real property, including to pay down the mortgages and/or make improvements on three of those properties (as identified in Exhibit A attached to the Agreement), there would be no community benefit, thereby disadvantaging Kristi. (See *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371–372 ["Where community funds are used to make payments on property purchased by one of the spouses before marriage 'the rule developed through decisions in California gives to the community a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds.' "]; see also *In re Marriage of Wolfe* (2001) 91 Cal.App.4th 962, 967 ["[T]here is no logical basis for denying a spouse reimbursement for a community-funded improvement to the other spouse's separate property."].)

Fabian nonetheless claims the Agreement was mutually beneficial to each spouse because he had no community interest in real property Kristi owned, nor in her earnings (unless she deposited them in the joint checking

_____

[12]    Section 7 of the Agreement provides in part:  "The Parties have established a joint checking account which is considered community property. It is contemplated by the Parties that their joint living expenses will be paid from said account.  The Parties agree that each *may* contribute sums to the joint account from time to time as agreed upon by and between the Parties. All such funds from the Parties shall become community property funds *when deposited* in said account[ ]."  (Italics added.)

14

account).  Fabian's claim is merely a request that we reweigh the evidence and make new findings, which as a court of review we cannot do.  (See *Mathews, supra*, 43 Cal.App.5th at p. 251; *Pope, supra*, 229 Cal.App.4th at pp. 1245–1246.)

In any event, we note Exhibit B of the Agreement listed Kristi's real property assets as an "undivided one-half (1/2) interest in the Mobile home space" located in Boulder City, Nevada, a property she co-owned with a relative with an estimated value to Kristi of $20,000.  However, Kristi also owed half the mortgage on the Nevada property, which at the time of signing was about $16,000.

In addition, Kristi earned substantially less than Fabian, as she was also the primary caretaker for their young children.  And at the time of signing, Fabian's assets (minus liabilities) were about $611,400, while hers were about $37,000.

We conclude substantial evidence supports the trial court's finding that Kristi met the prerequisite elements to invoke the statutory presumption under section 721, subdivision (b).  (See *Haines, supra*, 33 Cal.App.4th at p. 301 [(1) existence of an interspousal transaction and (2) one spouse has obtained an advantage over the other].)  We therefore conclude the court properly placed the burden on Fabian to overcome the presumption.  (See *Cover, supra*, 188 Cal. at pp. 143–144; *Haines,* at p. 301; *Baltins, supra*, 212 Cal.App.3d at p. 88; but see *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 717 [concluding the presumption of undue influence did not apply because substantial evidence supported the trial court finding there was nothing "unfair" about the parties' interspousal agreement:  "both spouses obtain[ed] advantages, both [were] represented by independent and competent legal counsel, the wife [was] offered full access to the husband's

15

business records relating to the marital assets, and both spouses acknowledge[d] in the agreement that neither ha[d] obtained any unfair advantage as a result of the agreement"].)

B. *Fabian Did Not Rebut the Presumption of Undue Influence*

Fabian next claims that even if he bore the burden to overcome the presumption of undue influence under section 721, subdivision (b), he proffered sufficient evidence to rebut the presumption. He argues the evidence showed that Kristi " 'freely and voluntarily' " entered into the Agreement with "full knowledge of all relevant facts and a complete understanding of the effect of the transaction." (See *Haines, supra*, 33 Cal.App.4th at p. 296.)

Because Fabian bore the burden of proof, for him to succeed on appeal he must show the evidence compels a finding in his favor as a matter of law. " '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227 (*Luis H.*); accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*) [when the factfinder rules a party has not met his or her burden of proof at trial, the standard of review is not substantial evidence, but " 'whether the evidence compels a finding in favor of the appellant as a matter of law' "].) Under this standard, the party with the burden of proof at trial must show on appeal that its evidence was (1) " ' "uncontradicted and unimpeached" ' " and (2) " ' "of such a character and weight as to leave no room for a judicial determination that it was sufficient to support a finding." ' " (*Dreyer's*, at p. 838; accord, *Luis H.*, at p. 1227.)

Here, substantial evidence supports the trial court's finding that Kristi did not freely and voluntarily enter into the Agreement. Indeed, she *first* became aware of Fabian's desire to enter into a postnuptial property agreement on March 23, 2015, when he called her at work and asked that they meet at his attorney's office over her lunch hour. It was there that Kristi was *first* presented with the proposed agreement. During her first and only meeting with Spencer, he advised her not to sign that day because she was too upset. Kristi then was most concerned about the provisions regarding Fabian's estate plan, as they had a young child. The following day, Kristi for the *first* time was included on e-mails between Fabian and Spencer regarding changes to the proposed agreement. In one of those e-mails Fabian requested Spencer revise the provisions regarding his estate and have the updated agreement ready for signature the following day, just two days after Kristi had been presented with a draft.

And perhaps most significantly, Kristi felt pressured to sign the Agreement on March 25, after Fabian threatened he would not attend the couple's wedding celebration on April 4 in San Diego. Kristi alone had planned the celebration, had spent "thousands of dollars" of her money in its preparation, and had invited their family and friends to attend.

This evidence is ample support for the trial court's finding that Kristi was pressured into signing the Agreement, which facts are similar to those in *Haines*, where the wife felt pressured into signing the quitclaim deed in return for her husband to co-sign the loan for her purchase of an automobile. (See *Haines, supra*, 33 Cal.App.4th at p. 285.) As a result, Fabian on appeal cannot establish as a matter of law that Kristi entered into the Agreement of her own free will. (See *Luis H., supra*, 14 Cal.App.5th at p. 1227; accord, *Dreyer's, supra*, 218 Cal.App.4th at p. 838.)

17

That Fabian testified differently, claiming that since January 2015 he and Kristi had discussed his desire for a postnuptial agreement, and that she knew he had consulted an attorney and was gathering financial information for preparation of such an agreement, does not change our conclusion. For one thing, the trial court found Kristi's version of the chronology of events leading up to the signing of the Agreement more credible than his. (See *Mathews, supra*, 43 Cal.App.5th at p. 251 [as a court of review, we do not judge the credibility of witnesses].) For another, our role is not to reweigh the evidence and make new findings contrary to those of the fact finder, but instead to uphold those findings if supported by substantial evidence. (See *ibid.*; accord, *Pope, supra*, 229 Cal.App.4th at pp. 1245–1246.)

In addition, substantial evidence supports the trial court's finding that Kristi did not have full knowledge of all the facts when she signed the Agreement. (See *Haines, supra*, 33 Cal.App.4th at p. 296.) Kristi believed Fabian had purchased the Merced Property before they were married and it was his separate property, as also identified in Exhibit A attached to the Agreement. However, Kristi presented additional evidence showing Fabian purchased the property in June 2014, about two months *after* their courthouse wedding, at or near the time she gave birth to their first child. Although Fabian claimed he purchased the Merced Property before their marriage, the trial court credited Kristi's testimony and found otherwise. Thus, this evidence, which we deem substantial (see *Pope, supra*, 229 Cal.App.4th at p. 1245), does not compel a finding as matter of law that Kristi had full knowledge of all the facts when she signed the Agreement (see *Luis H., supra*, 14 Cal.App.5th at p. 1227; *Dreyer's, supra*, 218 Cal.App.4th at p. 838).

18

Finally, substantial evidence also supports the trial court's finding that Kristi did not have a "complete understanding of the effect of" the Agreement when she signed. (See *Haines, supra*, 33 Cal.App.4th at p. 296.) As noted, Kristi had just two days between the time Spencer first presented her with a draft of the proposed postnuptial agreement and signature. With such short notice and the wedding celebration just days away, she did not have the opportunity to consult an attorney to advise her on the effects of the Agreement. Thus, when Kristi signed she did not understand that she was giving up her community property rights to Fabian's salary (unless deposited in the joint account), retirement funds, and real property. And, although Spencer met with Kristi once on March 23, he did not discuss the legal effects of the proposed agreement with her, as she was not his client, was too upset, and, in any event, was then focused on the provisions regarding Fabian's estate plan and their upcoming wedding celebration.

Because Fabian on appeal cannot show the evidence compels a finding as a matter of law that Kristi knowingly and voluntarily entered into the Agreement, had a full understanding of what community assets existed at the time of signature, and had complete knowledge of the effect of the Agreement on her community property rights (see *Haines, supra*, 33 Cal.App.4th at p. 296), we reject his challenge to the evidence. We thus conclude the trial court properly found he did not rebut the statutory presumption of undue influence under section 721, subdivision (b), and that the Agreement was therefore void and unenforceable.

## IV.

## DISPOSITION

The October 25 Order invalidating the Agreement is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.