Filed 8/21/25  H.H. v. J.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| H.H.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>J.H.,<br><br>        Defendant and Respondent. | A171358<br><br>(Alameda County Super. Ct. No. HF20081757) |

H.H. (mother) appeals a custody order transferring physical custody of her two children to J.H. (father) after she sought to relocate with the children from Taiwan to California. Mother contends that the trial court erred by determining physical custody de novo rather than applying the changed circumstance rule to her proposed relocation.  Alternatively, she contends that the court erred by considering ex parte communications from a court mediator in deciding the children's best interests.  We agree that the court applied the incorrect standard, and accordingly we reverse the order and remand so that the trial court may consider mother's move-away request under the proper standard.  In light of this conclusion, we do not address mother's alternative contentions.

## BACKGROUND

In 2020, mother and father separated and mother moved with her two children, then aged seven and nine, to Taiwan. Father moved to Taiwan shortly thereafter. In December 2020, mother filed a petition in the Alameda County Superior Court for dissolution of her 15-year marriage to father.

In July 2023, while the family was still living in Taiwan, the court entered an order awarding the parents joint legal custody and mother physical custody with visitation for father.

On May 1, 2024, mother emailed father informing him that she had accepted a job in California and she and the children would be returning to California on June 9. She offered to arrange a new visitation schedule if he chose to stay in Taiwan.

On June 6, father filed a request for a temporary emergency order to stop mother from moving with the children. He also requested temporary sole custody of the children and that mother be sanctioned for attempting to abduct the children. Mother opposed father's request for sole custody of the children and for sanctions but agreed to leave the children with father in Taiwan until the court could resolve the custody dispute. The court set a custody hearing and issued a temporary order requiring that the children remain with father in Taiwan until the hearing. The court also directed the parents to participate in mediation as soon as possible.

In August 2024, the mediator submitted her report to the court. The report includes statements from both mother and father. The mediator reported that, according to father, mother's

2

proposed move back to California "follows exactly how [mother] moved to Taiwan with the children. He alleges she didn't provide notice to him then and unilaterally made this decision." According to father, the "initial move [to Taiwan] was difficult on the family, but especially the children. They had to get used to a new environment, culture and learn a new language. The children also missed [father] terribly, wanted to see him, and often called crying. [Father] notes that the children have never voiced wanting to return to the U.S. until recently since [mother] has moved. The children have now been living in Taiwan for 4 years and have settled into a happy life." According to mother, the initial move was not a unilateral decision, father helped her with that move, and since father moved to Taiwan he has played only a marginal role in the children's lives. She claims that "[h]e is not part of their school routines, does not support or attend their extra-curricular activities, and will decline additional offers for visitation when [she] is not available." Mother "shared that her desire to move to the U.S. is motivated by the children because they maintain the same position: they are not happy, do not like living in Taiwan, and want to return to the U.S. [Mother] does not believe that a move back to the U.S. would be hard on the children because she views this as a return back to their 'home' country."

The "child interview" section of the report reads in relevant part as follows, "[N.H., the younger child] was very talkative and had lots of questions about the differences in school environment, culture, and structure between Taiwan and U.S. [She] was very

worried about getting lost in a new school and not having the same friends. [¶] Both children were very anxious about the summer coming close to an end and not knowing where they will be attending school. [K.H., the older child,] had more concerns to share about the overall sexualization of woman in Taiwan culture and was stressed about the entrance exam she is required to take to be placed for high school. [She] voiced a specific preference to attend school in the U.S. She hopes she will be able to have a more well-rounded life that is not so focused on academic achievement. Overall, both children expressed a preference to attend a new school in the U.S. if it meant being close to their mother. [¶] Both children talked a lot about missing their mother and 13-year-old dog 'Mochi'. [N.H.] was so emotional at multiple points in the conversation she kept turning off her screen to regulate herself before rejoining. The children shared having to rely on each other for comfort. They explained that instead of focusing on them, trying to understand them and comforting them, their father is focused on himself. During this time of separation from their mother their father has spent time sharing stories that make them feel bad. They don't believe this is intentional. Instead, these stories are meant to help them understand him and what he went through when they first moved to Taiwan. These stories are sad and not always kind about their mother. The children reported that they have been able to stay in communication with their mother twice a day and are also comforted by the fact that they will see her soon for [N.H.'s] birthday. [¶] The current arrangement came as a big

4

shock to them.  They explained that they were used to living with their mother and only seeing their father every other weekend.  They also love their father and shared that it is 'not bad living here (with him)'.  However, they miss and prefer to be with their mother since she is who they are used to.  They also struggled with the idea that they probably would also miss their father if they lived with their mother, but maybe 'just a little less'.  The children shared that both parents described the visitation schedule that they would follow after the court decides where they would live.  Both children felt the schedule was fair but dreaded the idea of not seeing their mother everyday and having to travel to see the other parent. [N.H.] particularly hates flying."

Ultimately, the mediator's recommendation is as follows: "At this time, the counselor supports [father's] request to keep the children in his primary care in Taiwan.  It is clear after talking to the children that they define 'home' as being with and anywhere their mother is.  The youngest child barely remembered the U.S. and expressed having a lot of nerves and anxiety about moving.  However, both children were clear that they are not used to being in their father's care.  Per the parties' reports, [father] has consistently visited with the children on alternating weekends for the past year.  He is not involved in the children's day-to-day activities nor had them in his care for extended periods of time outside of vacations as arranged by the parties.  Nevertheless, it is important that [mother] take responsibility for current circumstances and that the Court admonish her for making a unilateral decision to move out of the

5

country with the children despite having joint legal custody. It is clear that after 4 years of being in Taiwan the children have acclimated to the culture and have established a friend group and developed their relationships with extended relatives. The counselor would be concerned that if the children returned to [mother's] primary care it would enable and embolden her to continue to make drastic and unilateral decisions that significantly impacts [father's] access to the children."

At the hearing, the court identified what it considered a possible "conflict" in the mediator's recommendation. The court explained that the mediator wrote that she "supports [father's] request to keep the children in primary care in Taiwan" but also that the children "define home as being with and anywhere their mother is." The court indicated that during a break it would try to contact the mediator to confirm her recommendation.

After a brief recess during which he called the mediator, the judge stated on the record: "So, over the break I was able to contact the counselor . . . who mediated this Family Court Services matter. And she reiterated that there are no typos. [¶] That she absolutely intended to recommend that [father] should [] maintain primary physical custody of the children. [¶] That she made the decision with a lot of—a lot of thought, because she understood that this was a very difficult case. And she also understood that the children have a strong attachment to the mother. [¶] And the reason why she made the decision she made, is twofold, and she says this in her report, and what she told me on the phone isn't any different than what she says in her

6

report, she said: That the children, although they have a stronger attachment to Mom, they see their father as a significant attachment figure as well. [¶] They have a positive attachment with Dad. In fact, when the first move happened to Taiwan, when Mom took the kids and moved to Taiwan, and then Dad eventually had to follow to be with the kids, they had a lot of trouble missing Dad, and adjusting, because they had a stronger attachment to Dad. [¶] Secondarily, based on her interview with the children, she notes, and she said this in her report: The kids do not have any attachment to the United States, that that's Mother's attachment, and Mother's, I guess, interpretation, but that the counselor did not see an actual attachment. [¶] In fact, she was surprised that Mother calls the United States home. [¶] The children think home is wherever their parents are: Primarily, where their mother is, because they have a stronger attachment to Mother. [¶] But the children express a lot of anxiety about leaving Taiwan, and going to the United States. [¶] And, in fact, the only reason that they would even consider making such a drastic move to the United States, is because of their love for their mom, because they wanted to be with their mother, not because the United States is home, not because it would be easy to acclimate. [¶] They're very anxious about coming here: They don't want to. The only reason they would want to, or consider it, is because they love their mom. [¶] And the other thing, is that they would really miss Dad. They've expressed that in their interview and explained that it was a big deal that they were not going to have Dad in the United States

7

with them. [¶] That they have a strong attachment to Dad, but that just completely goes over Mother's head, to the point where she has no empathy for her children, and their feelings about the United States, and about missing their father. [¶] And that's what raised such big concerns with [the mediator], as a family therapist, she thought that that was a problem for Mother not to realize these things. [¶] The visceral response that these children indicated, their body, their emotional wellbeing, how upset they were, and how they would clench, and how they would turn off their camera, and they couldn't handle the move, and what the drastic measures that Mom had taken, just goes over Mom's head. That she didn't have the sensitivity, or she had a lack of sensitivity for her children, and that is the biggest concern that mediator had, and that is why she recommended against what she normally would. [¶] She says she almost always recommends for the children to stay with the parent to which they have the strongest attachment, but in this case, she went against what she usual[ly] does, and recommended Father, because of Mother's behavior."

The court expressed its agreement with the mediator's observations noting that this was the second time mother has "unilaterally decided to take her kids and go, without [f]ather's input." The court also observed that "when I said to her that she did a horrible, drastic thing in making this unilateral decision, she had a poker face. She continues to have a poker face. She shows no indication of remorse, or sympathy, or empathy, or any emotion, whatsoever, to this Court." Ultimately, the court found

8

that awarding physical custody to father would be in the children's best interests. The court explained, "[T]here are two little girls who love their father, and they have a strong attachment to him. [¶] Instead of putting her own ego aside, and considering, and empathizing with her daughters, and trying to preserve that attachment, that positive relationship that they have with their father, she takes them away. [¶] She books airplane tickets before she get[s] a Court order or consent from the father: That's unacceptable." The court also noted that awarding physical custody to father "increase[s] their stability in life to maintain a life in Taiwan, in which they've lived for four years, so they're going to remain there."

DISCUSSION

## I. Standard of Review

The standard of review applicable to custody and visitation orders, including international move-away orders, is the deferential abuse of discretion test. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).) We reverse the family court's order only where the appellant has shown the court has abused its discretion by unreasonably concluding that its order was in the best interest of the child. (*Burgess*, *supra*, 13 Cal.4th at p. 32.) We presume the move-away order is correct. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93–94.) We do not reweigh the evidence or assess the credibility of witnesses; instead, we defer to the court's adjudication of the facts. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)

9

The question, however, of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law requiring de novo review.  (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 821.)  "[A] discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial evidence to support that order.  [Citations.]  If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law."  (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 16.)

Mother, as the appellant, " 'bears the affirmative burden to show error.' "  (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078.)  Although father's brief does not address many of the issues raised by mother, his "failure to address an issue raised in the opening brief" is "not a concession."  (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 557, fn. 48.)  Ultimately, "we 'examine the record and reverse only if prejudicial error is found.' "  (*Smith v. Smith*, *supra*, 208 Cal.App.4th at p. 1078.)

## II.  Applicable Legal Standard

Initially, father seems to be arguing that the court's order was properly granted under Family Code[1] section 3048 to prevent

---

[1] All undesignated statutory references are to the Family Code.

10

mother's abduction of the children. Although father's petition sought an emergency restraining order and the court issued a temporary order prohibiting the children from leaving Taiwan, at the subsequent hearing, the court did not discuss or make any of the required findings under section 3048, subdivision (b). Rather, the court stated that it was deciding custody in the context of a move-away request by mother. The court explained, "I think this is a move away. The kids were living in Taiwan for four years. And, you know, if it was intended to be temporary, that's great. But . . . at some point, it becomes their home. And four years, for a child, is a long time." Father did not object to the court's determination in the trial court. Accordingly, we too review this case as a move-away proceeding, not a potential abduction proceeding.

The law applicable in move-away cases is well settled. First, the court must determine whether there exists a final judicial custody determination that awards physical custody to one parent. (*Burgess*, *supra*, 13 Cal.4th at p. 37.) In *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 258 (*Montenegro*), the court held that a custody order that is based on the parties' stipulation may be considered a final judicial custody determination "if there is a clear, affirmative indication the parties intended such a result."

If no final custody determination has been made or if the parents share physical custody, the court "must determine de novo what arrangement for primary custody is in the best interest of the minor [child]." (*Burgess, supra,* at p. 40, fn. 12, 31 [for purposes of an initial custody determination, section 3040,

11

subdivision (b), affords the trial court " 'the widest discretion to choose a parenting plan that is in the best interest of the child' "].)

If, however, one parent has been awarded physical custody of the children, that parent "has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." (§ 7501, subd. (a).) In *Burgess, supra*, 13 Cal.4th at pages 37 to 38, the court explained that " '[O]nce it has been established [under a judicial custody determination] that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest.' " "In a 'move-away' case, a change of custody is not justified simply because the custodial parent has chosen, for any sound good faith reason, to reside in a different location, but only if, as a result of relocation with that parent, the child will suffer detriment rendering it ' "essential or expedient for the welfare of the child that there be a change." ' " (*Id.* at p. 38; see also *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 959–960 (*Brown & Yana*) [noncustodial parent "bears the initial burden of showing that the proposed relocation of the child's residence will cause detriment to the child, requiring a reevaluation of the existing custody order"].) The California Supreme Court has clarified that in a typical move-away case, "[t]he likely impact of the proposed move on the

12

noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all of the relevant factors, may be sufficient to justify a change in custody." (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1078 (*LaMusga*).)

As noted above, if the noncustodial parent has not made a sufficient showing of detriment, the court " 'should preserve the established mode of custody.' " (*Burgess, supra,* 13 Cal.4th 25, 37–38.) "[T]he paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements." (*Id.* at pp. 32–33.)

If, however, "the noncustodial parent makes the required initial showing of detriment, the court is then obligated to 'perform the delicate and difficult task of determining whether a change in custody is in the best interests' of the child." (*Brown & Yana, supra*, 37 Cal.4th at p. 960.) "Among the factors the court ordinarily should consider when deciding whether to modify custody in light of a proposed move are the following: the child's interest in stability and continuity in the custodial arrangement; the distance of the move; the child's age; the child's relationship with both parents; the relationship between the parents, including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the child's interests above their individual interests; the child's wishes if the child is mature enough for such an inquiry to be appropriate; the

13

reasons for the proposed move; and the extent to which the parents currently share custody." (*Id.* at pp. 960–961, citing *LaMusga, supra,* 32 Cal.4th at p. 1101.)

Finally, where a final judicial custody determination exists, an evidentiary hearing in a move-away situation "should be held only if necessary." (*Brown & Yana, supra,* 37 Cal.4th at p. 962.) "[A]n evidentiary hearing serves no legitimate purpose or function where the noncustodial parent is unable to make a prima facie showing of detriment in the first instance, or has failed to identify a material but contested factual issue that should be resolved through the taking of oral testimony." (*Ibid.*) However, where no final judicial custody determination has been made and the court is deciding custody de novo, parents are entitled to a full evidentiary hearing on disputed issues, if timely requested. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1360.)

Here, the trial court found that the July 2023 order—which was made by a different judge—was not a final judicial custody determination. The court explained that, based on its review of the record, "we don't even have a findings and order after hearing for custody and visitation, let alone a *Montenegro*-type order." The court stated that "a *Montenegro* order has to say '*Montenegro*' or 'Final order' on the order" and that the minute order did not meet that requirement. Accordingly, the court concluded that it was required to determine the best interests of the children de novo without reference to "the *LaMusga* factors." In an apparent mix of the two different standards, however, the court also denied

14

father's request for an evidentiary hearing on the ground that father had not made a sufficient showing of detriment and thus, under *Brown & Yana*, he was not "entitled to an evidentiary hearing for a move away."

In her opening brief, mother acknowledges that the trial court found that the July 2023 order was not a final judicial custody determination. Although her counsel disagreed with that determination in the trial court, on appeal mother merely assumes without argument that the July 2023 order was a final judicial custody determination and argues that the trial court abused its discretion by determining the children's best interests de novo after finding that father failed to make the required showing of detriment. By failing to properly raise the issue, mother arguably forfeited any challenge to the court's finding that custody had not been finally determined. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556–557 [appellant bears the burden to demonstrate error, and provide adequate citation to the record, and to present reasoned argument with citation to supporting legal authorities].) Nonetheless, insofar as this initial determination is critical to the court's exercise of discretion in this matter, we will consider whether the trial court correctly concluded that the July 2023 order was not a final judicial custody determination.

The record before this court regarding the entry of the July 2023 order is limited. An order entered in April 2023 set a hearing on July 17, 2023, for a long-cause trial on the issues of custody and visitation, child support, division of property and

15

reimbursements. The minute order from the July hearing indicates that both mother and father testified but the transcript of the proceedings is not included in the record. With regard to custody and visitation, the minute order reads: "The Court adopts the parties agreement as follows: Father shall have visitation every other Friday from 6pm to Sunday 6pm. Commencing the second weekend after [father] is no longer experiencing covid symptoms. [Father] shall inform his counsel and [father's] counsel shall then inform [mother's] counsel. After the first visit, visits will continue on an ongoing basis every other weekend. [¶] The Court finds [father's] testimony credible that covid restrictions did partake in [sic] visitation. The Court believes most missed visits were not father's fault. [¶] The Court finds the Family Code Presumption has not been overcome and AWARDS mother and father with joint legal custody and mother with physical legal custody with visitation to the father." As the trial court noted later, the minute order directs mother's counsel to "prepare Findings and Order After Hearing." At the hearing, the parties agreed that mother's counsel prepared and submitted a final order to the court, but for unknown reasons it was never entered despite some efforts by the parties to follow up.

Insofar as the order "awards" custody after a long-cause trial, it is possible to read the order as a final judicial determination of custody, with the parties' agreement extending only to the terms of visitation. It is also undisputed that the parties viewed the court's custody award (as reflected in the minute order) as final despite the fact that the formal order

16

circulated by the parties after the hearing was never entered. If read as such, *Montenegro* is inapplicable and the court erred in concluding that physical custody had not been finally determined. In any event, we would reach the same conclusion even if the parties' agreement extends to physical custody as well as visitation.

If physical custody was determined by agreement, rather than contested at trial, the order may only be considered a final judicial custody determination "if there is a clear, affirmative indication the parties intended such a result." (*Montenegro, supra*, 26 Cal.4th at p. 258.) Here, there are strong circumstantial indicators that the order was intended to reflect a final custody determination. The matter was set for a trial on the issue of child custody at which the parties both testified, at least in part about issues relevant to child custody. Thereafter, the parents abided by the custody order for almost a year and only returned to court because mother sought to relocate. Accordingly, on this record, the court erred in concluding that the July 2023 order was not a final judicial custody determination.

Having erred at this critical juncture, the court thereafter exercised its discretion based on an erroneous understanding of applicable law. Having concluded that custody should be decided de novo, the court expressly declined to consider the relevant factors identified by the court in *LaMusaga* and *Brown & Yana*. The court explained, "I think that the only standard I'm looking at, is the best interest of the child. . . . And at very most, . . . if [the] best interest of the child is not sufficient, the Court will also

further look at stability of the child:  Those are the two factors that the Court must make findings on when determining if a move away is appropriate.  [¶]  And then, I don't even think stability needs to be discussed, but I will, in an abundance of caution."

The court's error was prejudicial.  Insofar as the court relied almost exclusively on the impact of the move on the children's relationship with father, the court abused its discretion.  (See *F.T. v. L.J.*, supra, 194 Cal.App.4th 1, 23 [court abused discretion by changing custody order based on detriment to noncustodial parent's relationship without consideration of other relevant factors].)  While the court correctly considered the impact of the proposed move on the children's relationship with father, that factor must be considered " '*in light of all the relevant factors*,' " including "one of the most important factors in determining a move-away motion—i.e., Child's need for continuity and stability in established custody arrangements." (*Id*. at p. 24, citing *LaMusga, supra,* 32 Cal.4th at p. 1101; see *Burgess*, *supra*, 13 Cal.4th at p. 32 [identifying as "most important" the fact that "children had been in the sole physical custody of the mother for over a year at the time the trial court issued its order concerning permanent custody"].)  Here, to the extent the court briefly referenced the stability of the children, it did so in connection with the location of their home, not the prior custodial arrangement.  Accordingly, we reverse the custody

order and remand so that the court may exercise its discretion under the proper legal framework.[2]

While the trial court initially determined that father had not made a sufficient showing of detriment to support modification of the existing custody arrangement, almost a year has passed since that time. Given the possibility that additional circumstances have developed during the pendency of this appeal which may impact that determination, "we cannot bar the trial court from consideration of such circumstances on remand." (*Speelman v. Superior Court* (1983) 152 Cal.App.3d 124, 133; *In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 764 [recognizing that because additional circumstances bearing on the child's best interests may have developed during the nearly two years since improper custody order was entered, appellate court's "decision does not finally determine the custody of the child"].)

---

[2] In light of this conclusion, we need not consider mother's additional arguments that the court's determination of the children's best interests was tainted by the court's improper ex parte communication with the court-appointed mediator and that she was wrongly denied the opportunity to question the mediator regarding new information relayed during that conversation. While resolution of these issues is not necessary in the present appeal and we acknowledge that the record raises unaddressed concerns regarding waiver and forfeiture, we note nonetheless that it appears highly unusual for a court to engage in and rely on a private conversation with a mediator but deny the parties an opportunity to question the mediator on the substance of that conversation.

**DISPOSITION**

The custody order is reversed and the matter remanded for further proceedings. Mother is awarded costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.